### SILSBURY & CALKINS *vs.* McCOON & SHERMAN.

Where a quantity of corn was taken from the owner by a *wilful* trespasser and converted by him into whisky, *held*, that the property was not changed, and that the whisky belonged to the owner of the original material.

And held further, that a creditor having an execution against the owner of the corn, might seize the whisky and sell it to satisfy his debt.

If a chattel wrongfully taken retains its original form and substance, or may be reduced to its original materials, it belongs to the original owner; and this rule, it seems, holds against an innocent purchaser from the wrongdoer, without regard to the increased value bestowed by him upon the chattel.

But if the chattel be converted by an *innocent* purchaser or holder into a thing of a *different species*, as where wheat is made into bread, olives into oil, or grapes into wine, the original owner can not reclaim it.

There is no such distinction, however, in favor of a *wilful* wrongdoer. He can acquire no property in the goods of another by any change wrought in them by his labor or skill, however great the change may be, provided it can be proved that the improved article was made from the original material. There is no difference between the civil and the common law in this respect.

THIS was an action of trover for a quantity of whisky. On the first trial before WILLARD, circuit judge, at the Montgomery

circuit, in May, 1843, the plaintiffs were nonsuited. The supreme court on bill of exceptions set aside the nonsuit, and ordered a new trial. (*See* 6 *Hill*, 425.) The case was again tried in November, 1844, before the same judge. On that trial it was proved, that one Hackney, a deputy of the sheriff of Montgomery county, on the 22d of March, 1842, by virtue of a *fi. fa.* issued on a judgment in the supreme court in favor of McCoon and Sherman, the defendants, against Uriah Wood, sold the whisky in question, being about twelve hundred gallons, having made a previous levy thereon; and that upon the sale the defendants became the purchasers, and afterwards converted it to their own use. The whisky was levied on and sold at the distillery of the plaintiffs, who forbade the sale.

The plaintiffs having rested, the defendants offered to prove, in their defence, that the whisky was manufactured from corn belonging to Wood, the defendant in the execution; that the plaintiffs had taken the corn and manufactured it into whisky without any authority from Wood, and knowing at the time they took the corn that it belonged to him. The plaintiffs' counsel objected to this evidence, insisting that Wood's title to the corn *was extinguished by its conversion into whisky*. The circuit judge sustained the objection and refused to receive the evidence. The defendants' counsel excepted. The plaintiffs' had a verdict for the value of the whisky, which the supreme court refused to set aside. (*See* 4 *Denio*, 332.) After judgment the defendants brought error to this court, where the cause was first argued by *Mr. Hill,* for the plaintiffs in error, and *Mr. Reynolds,* for the defendants in error, in September, 1848. The judges being divided in opinion, a re-argument was ordered, which came on in January last.

*N. Hill, Jr.* for the plaintiffs in error.(a)

*M. T. Reynolds,* for the defendants in error.

---

(a) The following is the substance of the argument of Mr. Hill. It is deemed worth preserving as the result of a careful examination into a branch of

Silsbury *v.* McCoon.

RUGGLES, J. It is an elementary principle in the law of all civilized communities, that no man can be deprived of his property, except by his own voluntary act, or by operation of law. The thief who steals a chattel, or the trespasser who takes it by force, acquires no title by such wrongful taking. The sub-

the law both interesting and important. I. Unless it can be shown that there is an essential difference between the common and civil law, on the question in this case, the defendants in error clearly acquired no title by *fraudulently* converting Wood's corn into whisky. By the *general rule* of the Roman civil law, proceeding upon the principle that no one can be deprived of his property without his consent, title could not be acquired by any change wrought in the materials of another, however great the change, or the labor of producing it. The only *exception* to the rule was, where the change rendered the new product incapable of being reduced to its original materials. (*Wood's Inst.* 92, *Lond. ed.* 1804; 1 *Brown's Civil and Adm. Law,* 240, 241.) The exception, however, was carefully qualified, so as to limit it to the case of labor *honestly bestowed,* and avoid encouraging *wilful* invasions of the rights of property. Hence it was never allowed, where the change in the materials, however great, was wrought *with knowledge that they belonged to another.* " If any one shall make wine with my grapes, oil with my olives, or garments with my wool, *knowing they are not his own,* he shall be compelled by action to produce the said wine, oil, or garments." (*Digest, Lib.* 10, *tit.* 4, *leg.* 12. § 3.) " There must, in order to give title to the workman, be a change of *species,* and the materials must have been taken *in ignorance of their being the property of another.*" (1 *Brown's Civil and Adm. Law,* 240, 241 ; *Wood's Inst.* 92, *Lond. ed.* 1704; 5 *John. Rep.* 349, 350 ; 6 *id.* 169, 170.) The civil law, therefore, in dealing with the case of *fraudulent* accession, treated the workman as one who had *volunteered to serve the owner of the material without compensation.* " He who *knows* the material is another's, ought to be considered in the same light as if *he had made the species in the name of the owner,* to whom also he is to be understood to have *given his labor ;* like the case of him who *knowingly builds on another's ground.*" (*Vinnius' Inst. tit.* 1, *pl.* 25, *De specificatione.*) " If it is *known* that the grapes, &c. are another's, and yet thereof he [the workman] proceeds to make his wine, &c. he shall *lose his labor and workmanship ;* the whole shall accrue to the owner." (*Wood's Inst.* 92, *Lond. ed.* 1704.)

II. There is no evidence that the common law differs in any respect from the civil law, on the question in this case. On the contrary, there is strong reason to believe that both systems are alike. The civil law on the general subject of accession, especially accession by *specification, confusion* and *adjunction,* was adopted by the English as early as the time of Bracton, and there is no case showing that it was not adopted precisely as it stood in the Digest. (*Long's Discourses,* 87 *to* 89, *in vol.* 60 *of Law Library ; see* 15 *Eng. Com. Law,* 405,

sequent possession by the thief or the trespasser is a continuing trespass ; and if during its continuance, the wrongdoer enhances the value of the chattel by labor and skill bestowed upon it, as by sawing logs into boards, splitting timber into rails, making leather into shoes, or iron into bars, or into a tool, the manu-

---

406.) The doctrine laid down by Blackstone, and in the Year Book, (5 *Hen.* 7, *fol.* 15,) shows merely that the common and civil law are *alike* in respect to *bona fide* accession ; not that they *differ* as to *fraudulent* accession. (*See* 2 *Black. Com.* 404 ; 4 *Denio*, 335, *note* (*a.*) ) Chancellor Kent says: " The English law will not allow one man to gain title to the property of another upon the principle of accession, if he took the other's property *wilfully as a trespasser."* He assumes that the civil and common law on this subject are identical, and this has been *expressly held by our courts* from a very early period. (2 *Kent's Com.* 363 ; 5 *John.* 348, 349 ; 6 *id.* 168, 169 ; 2 *Rawle's Rep.* 423, 427 ; 9 *John. Rep.* 362, 363 ; 8 *Wend.* 508.) In the kindred case of accession by *confusion* or intermixture, the common law has gone even beyond the civil law in discriminating between *unintentional* and *wilful* wrongs. There, if the intermixture be by consent or accident, the proprietors become tenants in common. But if it be *wilful,* the common law, " to *guard against fraud, gives the entire property, without any account,* to him whose original dominion is invaded, and attempted to be rendered uncertain, without his consent." (*Story on Bailm.* § 40 ; 21 *Pick.* 208, 304, 305 ; 7 *Shepley*, 287 ; 11 *Metcalf*, 493.)

III. The above authorities show affirmatively that the distinction between *bona fide* and *fraudulent* accession is a part of the common law ; and it is believed that no decision has ever been made in this country or in England which shows the contrary. The distinction, moreover, has been recognized in various other departments of the common law relating to the security of *rights* and *property*, and is in harmony with its general frame work and policy on that subject. The object at which it aims is not to *punish* wrongdoers, but to *prevent* their aggressions, and thus render punishment unnecessary. (*See* 2 *Bosw. Life of Johnson,* 512, 543, *Cro. ed.* 1831 ; 1 *Story's Eq.* 123, 3*d ed.*) It is a fundamental maxim of the common law, as it is of the civil law, that *no one can acquire title by his own act, without the owner's consent ;* nor is an exception ever made in favor of an *intentional* wrongdoer, but only in favor of *bona fide* acts, and then with great caution. (4 *Denio*, 327, 333 ; 10 *John. Rep.* 287, 288 ; 20 *Wend.* 275, 276, 277 ; 2 *Kent's Com.* 323 ; 11 *Wend.* 80.) It is also a maxim of the common and civil law that *a party can acquire no right or advantage by his own wrong*, whether it consist in violence or fraud. (*Broom's Legal Max.* 317, 318 ; 3 *Hill*, 282 ; 12 *Pick.* 270, 275 ; 4 *Hill*, 437, 439 ; 5 *id.* 158.) The common law, moreover, like the civil law, treats those who expend money or labor upon the property of another, *knowing that they are doing wrong*, as volunteer servants or agents, and compels them *to lose what they thus expend.* (4 *Paige's Rep.* 62 ; *Woodf. Land.*

factured article still belongs to the owner of the original mate-
rial, and he may retake it or recover its improved value in an
action for damages. And if the wrongdoer sell the chattel to
an honest purchaser having no notice of the fraud by which it
was acquired, the purchaser obtains no title from the tres-

*and Ten.* 306, *ed. of* 1804; 1 *Hill's Rep.* 240, *note;* 5 *Mees. & Welsb.* 351, 354;
8 *Wend.* 505, 508.) Nor does the common law, any more than the civil law,
regard the *degree of change* wrought in the property as material, but allows the
owner to follow it through all its changes; *e. g.* where *money* has been fraudu-
lently converted into *land* or *stocks,* &c. (*Ambler,* 409; 10 *Ves.* 516, 517; 3
*Maule & Selw.* 562, 574, 575; 2 *Grattan's Rep.* 544; 3 *Maule & Selw.* 189.)
And there is no reason for supposing that the common law has relaxed any of
its ancient rigor in this respect. "As civilization has progressed, the law has
tended much *more strongly* than it formerly did *to overthrow every thing which is
built upon violence or fraud.*" (5 *Hill,* 158, *per Bronson, J.*) In the present case,
the act of the plaintiffs below in taking the property, and their subsequent acts
in changing its species, were each and all, intentional trespasses and frauds upon
Wood. It is difficult to see, therefore, how the court can uphold their claim
without adjudging directly that *title may be acquired by wilful trespass and fraud;*
a mode of acquisition not recognized by any common law authority.

IV. The first argument of the court below, in favor of this mode of acquisition,
is inferred from the absence of *direct precedent* against it. (4 *Denio,* 334, 335.)
This argument proves nothing, if it be true, as has already been shown, that the
*general principles* of the common law are the other way. Those who affirm the
*exception,* ought to prove it. (3 *Barn. & Ald.* 245; 3 *Durnf. & East,* 63; *Ram
on Leg. Judgm.* 112, 113.) But there are *numerous precedents* against this mode
of acquisition. The principle on which it rests has been uniformly repudiated,
whenever the point has been presented. (5 *John. Rep.* 348, 349; 6 *id.* 168, 169;
2 *Rawle's Rep.* 423, 427; 9 *John. Rep.* 362, 363; 8 *Wend.* 508; 2 *Kent's Com.*
363; *Story on Bailm.* § 40; 21 *Pick.* 398, 304, 305; 7 *Shepley,* 287; 11 *Metcalf,*
493.) The silence of Blackstone on the question is entitled to no weight. His
object was to present a *general outline* of the law, without tracing its *subordinate
limits* and *minute qualifications.* (2 *Black. Com.* 404; 1 *id.* 34, 35; 1 *Schoale &
Lefroy,* 327.) The case in the Year Book, 5 *Hen.* 7, *fol.* 15, was plainly one
where the workman acted *honestly;* and yet it was held that *he acquired no title.*
The court were not called upon to speak as to *fraudulent* accession, and therefore
did not. (*See* 4 *Denio,* 355, *note* (*a.*) )

V. Another argument of the court below is founded upon the assumption that,
to allow the owner to appropriate the labor of the wrongdoer, would be an *unjust*
measure of *redress* and *punishment,* inconsistent with the general policy and
spirit of the common law. (4 *Denio,* 336, 337.) Considerations of this charac-
ter are foreign to the case. The true question is, whether the wilful trespasser

passer, because the trespasser had none to give. The owner of the original material may still retake it in its improved state, or he may recover its improved value. The right to the improved value in damages is a consequence of the continued ownership. It would be absurd to say that the original owner may retake

---

shall be *prevented* from profiting by his own wrong, and getting title by his own fraudulent act, without the owner's consent. He is not punished by being compelled to lose his *misdirected labor*, but simply *thwarted in his fraudulent object.* (*See* 4 *Denio*, 338, 339.) That it is not *unjust* to compel the workman to *lose his labor*, instead of compelling the owner to *lose his title*, has been held in a series of decisions which the court below do not question; *e. g.* where *leather* is made into *boots* or *shoes*, *cloth* into a *garment*, *trees* into *rails, shingles* or *coals.* (*See* 4 *Denio*, 333, 334; 5 *John. Rep.* 348, 349; 6 *id.* 168, 169; 2 *Rawle's R.* 423, 427; 9 *John. Rep.* 362, 363; 8 *Wend.* 508.) This rule prevails even where the workman has acted *innocently;* and if it be *just* in that case, *a fortiori* is it where he has acted *fraudulently.* The law relating to accession by confusion or intermixture, compels the fraudulent wrongdoer to *lose his property*, as well as *his labor*, be it more or less. (*Story on Bailm.* § 40; 21 *Pick.* 298; 7 *Shepl.* 287; 11 *Metc. Rep.* 493.) The court below ascribe to the ancient common law an undue degree of leniency toward violations of the rights of property. It protected property by punishing offences against it with extreme rigor, outstripping the civil law in this respect, and even *hanging* men who stole to the value of above *twelve pence.* (4 *Black. Com.* 236, 237.)

VI. The third and last argument of the court below is founded upon a supposed difficulty of tracing the connection between the materials taken from the owner, and the new product or species. (4 *Denio*, 237, 238.) This argument would make the title depend on the question whether the party could probably establish it or not on the trial, and is therefore wrong in *principle.* The supposed difficulty necessarily exists where *leather* has been made into *boots* or *shoes, trees* into *boards, shingles, rails* or *coal, iron* into *tools* or *nails, gold* into a *cup*, &c.; and yet it has never been allowed as an objection to following the property. (6 *John. Rep.* 169; 5 *id.* 349, 350; 2 *Rawle*, 427; 2 *Chitty's Bl.* 404, *note* (12) *by Christian;* 4 *Denio*, 333, 334; *and see note* (*a.*)) The difficulty exists in a still greater degree where *money* has been converted into *lands, stocks, notes*, &c.; and yet the substitute or product may always be claimed if identified *by evidence.* (10 *Vesey, jun.* 516, 517; *Ambler*, 409; 3 *Maule & Selw.* 562, 575, 578, 579; 2 *Grattan's Rep.* 544.)

VII. It is intimated in the opinion of the court below that the doctrine which allows the owner to seize the new product leads to absurd consequences; " for," it said, "if he may trace his title from corn to whisky, he may follow it as long as matter endures." (4 *Denio*, 338, 339.) If the property undergoes no change except such as is wrought *with intent to deprive the owner of his title*, it is right

Silsbury *v.* McCoon.

the thing by an action of replevin in its improved state, and yet that he may not, if put to his action of trespass or trover, recover its improved value in damages. Thus far, it is conceded that the common law agrees with the civil.

They agree in another respect, to wit, that if the chattel

that the intent should be *frustrated;* for there is clearly nothing *meritorious* in that species of labor. But if the property passes into the hands of a purchaser, or other person, who makes a similar change in it, *supposing it to be his own,* both the civil and the common law agree that this transfers the title. The case then becomes one of *innocent* or *bona fide* accession. (*See points I and II.*) Again, a *bona fide* purchaser would probably get the title, though he had made no change since he purchased. But if not, his case would only be like that of others purchasing from persons having no title. (*See* 2 *Grattan's Rep.* 554; 4 *Denio,* 327, 328.) Another limit to the owner's right of following the property is found in the doctrine of *adjunction; i. e.* where the new product or species becomes united as an accessary to something which is the principal, as boards, nails or paint, to a house, &c. (*Wood's Inst.* 93; *Brown's Leg. Max.* 203; 7 *John. Rep.* 473, 474, 475; 1 *Brown's Civ. and Adm. Law,* 241.) "This rule holds, though the addition of another person's goods to my own was dishonestly contrived; for here, only regard is had to the *things joined,* and not to *the person,* as before in specification." (*Wood's Inst.* 93.)

VIII. We submit, therefore, 1st. That the civil law, from which the common law on this subject was derived, made a plain distinction between *bona fide* and *fraudulent* accession, holding that no title could in *any case* be gained by the latter. 2d. That this principle is a part of the common law, having been adopted along with the general law of accession, and expressly recognized by various common law decisions; and 3d. That the arguments against it are founded upon views not sanctioned by the common law, but at variance with it.

IX. We submit further, that if the civil law is to be departed from in any respect, it should be by repudiating all distinction founded upon the *degree of. change* wrought in the property, and holding that *in no case can property be acquired by one's own act, without the owner's consent.* This would be far more in harmony with the maxims and policy of the common law than the principle on which the court below have acted; viz. that *one may acquire another's title without his consent, by a series of intentional trespasses, provided he perseveres so as to produce a change of species.*

X. If we are right as to the main question in this case, it follows that Wood was the owner of the whisky at the time of the levy and sale, and that the defendants below acquired title to it. There was no pretence on the trial that Wood had elected to waive his title, and resort to his remedy in trespass or trover for wrongfully taking the corn. On the contrary, the only ground there taken was, that the title had been changed *by manufacturing the corn into whisky.*

wrongfully taken, afterwards come into the hands *of an inno-cent holder* who believing himself to be the owner, converts the chattel into a thing of different species so that its identity is destroyed, the original owner cannot reclaim it. Such a change is said to be wrought when wheat is made into bread, olives into oil, or grapes into wine. In a case of this kind the change in the species of the chattel is not an intentional wrong to the original owner. It is therefore regarded as a destruction or consumption of the original materials, and the true owner is not permitted to trace their identity into the manufactured article, for the purpose of appropriating to his own use the labor and skill of the innocent occupant who wrought the change; but he is put to his action for damages as for a thing consumed, and may recover its value as it was when the conversion or consumption took place.

There is great confusion in the books upon the question what constitutes change of identity. In one case, (5 *Hen.* 7, *fol.* 15,) it is said that the owner may reclaim the goods so long as they may be known, or in other words, ascertained by inspection. But this in many cases is by no means the best evidence of identity; and the examples put by way of illustration serve rather to disprove than to establish the rule. The court say that if grain be made into malt, it can not be reclaimed by the owner, because it can not be known. But if cloth be made into a coat, a tree into squared timber, or iron into a tool, it may. Now as to the cases of the coat and the timber they may or may not be capable of identification by the senses merely; and the rule is entirely uncertain in its application; and as to the iron tool, it certainly can not be identified as made of the original material, without other evidence. This illustration therefore, con-

---

Wood could have authorized any one to seize the whisky, and the execution was as effectual an authority as any which Wood could have given. True, the defendants in error may be still liable to Wood for the trespass in *taking* the property, but not for the *property itself.* It would be an answer to an action by Wood *for the property*, that it had been seized by the sheriff and *applied to pay his debt.* (24 *Wend.* 379; 2 *Hill*, 201.)

tradicts the rule.   In another case, (*Moore's Rep.* 20,) trees were made into timber and it was adjudged that the owner of the trees might reclaim the timber, " because the greater part of the substance remained." But if this were the true criterion it would embrace the cases of wheat made into bread, milk into cheese, grain into malt, and others which are put in the books as examples of a change of identity.   Other writers say that when the thing is so changed that it can not be reduced from its new form, to its former state, its identity is gone.   But this would include many cases in which it has been said by the courts that the identity is not gone; as the case of leather made into a garment, logs into timber or boards, cloth into a coat, &c. There is therefore no definite settled rule on this question; and although the want of such a rule may create embarrassment in a case in which the owner seeks to reclaim his property from the hands of an honest possessor; it presents no difficulty where he seeks to obtain it from the wrongdoer; provided the common law agrees with the civil in the principle applicable to such a case.

The acknowledged principle of the civil law is that a wilful wrongdoer acquires no property in the goods of another, either by the wrongful taking or by any change wrought in them by his labor or skill, however great that change may be.   The new product, in its improved state, belongs to the owner of the original materials, provided it be proved to have been made from them; the trespasser loses his labor, and that change which is regarded as a destruction of the goods, or an alteration of their identity in favor of an honest possessor, is not so regarded as between the original owner and a wilful violator of his right of property.

These principles are to be found in the digest of Justinian. (*Lib.* 10, *tit.* 4, *leg.* 12, § 3.)   "If any one shall make wine with my grapes, oil with my olives, or garments with my wool, *knowing they are not his own,* he shall be compelled by action to produce the said wine, oil or garments." So in *Vinnius' Institutes, tit.* 1, *pl.* 25.   "He who knows the material is another's ought to be considered in the same light as if he had

made the species in the name of the owner, to whom also he is to be understood to have given his labor."

The same principle is stated by Puffendorf in his Law of Nature and of Nations, (*b.* 4, *ch.* 7, § 10,) and in Wood's Institutes of the civil law, p. 92, which are cited at large in the opinion of Jewett J. delivered in this case in the supreme court, (4 *Denio*, 338,) and which it is unnecessary here to repeat. In *Brown's Civil and Admiralty Law, p.* 240, the writer states the civil law to be that the original owner of any thing improved by the act of another, retained his ownership in the thing so improved, unless it was changed into a different species; as if his grapes were made into wine, the wine belonged to the maker, who was only obliged to pay the owner for the value of his grapes. The species however must be incapable of being restored to its ancient form; *and the materials must have been taken in ignorance of their being the property of another.*

But it was thought in the court below that this doctrine had never been adopted into the common law, either in England or here; and the distinction between a wilful and an involuntary wrongdoer herein before mentioned, was rejected not only on that ground, but also because the rule was supposed to be too harsh and rigorous against the wrongdoer.

It is true that no case has been found in the English books in which that distinction has been expressly recognized; but it is equally true that in no case until the present has it been repudiated or denied. The common law on this subject was evidently borrowed from the Roman at an early day; and at a period when the common law furnished no rule whatever in a case of this kind. Bracton, in his treatise compiled in the reign of Henry III, adopted a portion of Justinian's Institutes on this subject without noticing the distinction; and Blackstone, in his commentaries, vol. 2, p. 404, in stating what the Roman law was, follows Bracton, but neither of these writers intimate that on the point in question there is any difference between the civil and the common law. The authorities referred to by Blackstone in support of his text are three only. The first in *Brooks' Abridgment, tit. Property* 23, is the case from the

*Year Book* 5 *H. 7, fol.* 15, (translated in a note to 4 *Denio,* 335,) in which the owner of leather brought trespass for taking slippers and boots, and the defendant pleaded that he was the owner of the leather and bailed it to J. S. who gave it to the plaintiff, who manufactured it into slippers and boots, and the defendant took them as he lawfully might. The plea was held good and the title of the owner of the leather unchanged. The second reference is to a case in Sir Francis Moore's reports, p. 20, in which the action was trespass for taking timber, and the defendant justified on the ground that A. entered on his land and cut down trees and made timber thereof, and carried it to the place where the trespass was alledged to have been committed, and afterwards gave it to the plaintiff, and that the defendant therefore took the timber as he lawfully might. In these cases the chattels had passed from the hands of the original trespasser into the hands of a third person; in both it was held that the title of the original owner was unchanged, and that he had a right to the property in its improved state against the third person in possession. They are in comformity with the rule of the civil law; and certainly fail to prove any difference between the civil and the common law on the point in question. The third case cited is from Popham's reports, p. 38, and was a case of confusion of goods. The plaintiff voluntarily mixed his own hay with the hay of the defendant, who carried the whole away for which he was sued in trespass; and it was adjudged that the whole should go to the defendant; and Blackstone refers to this case in support of his text, that "our law to guard against fraud gives the entire property, without any account to him whose original dominion is invaded and endeavored to be rendered uncertain without his own consent." The civil law in such a case would have required him who retained the whole of the mingled goods to account to the other for his share, (*Just. Inst. lib.* 2, *tit.* 1, § 28;) and the common law in this particular appears to be more rigorous than the civil; and there is no good reason why it should be less so in a case like that now in hand, where the necessity of guarding against fraud is even greater than in the case of a mingling

of goods, because the cases are likely to be of more frequent occurrence. Even this liability to account to him whose conduct is fraudulent, seems by the civil law to be limited to cases in which the goods are of such a nature that they may be divided into shares or portions, according to the original right of the parties; for by that law if A. obtain by fraud the parchment of B. and write upon it a poem, or wrongfully take his tablet and paint thereon a picture, B. is entitled to the written parchment and to the painted tablet, without accounting for the value of the writing or of the picture. (*Just. Inst. lib.* 2, *tit.* 1, §§ 23. 24.) Neither Bracton nor Blackstone have pointed out any difference except in the case of confusion of goods between the common law and the Roman, from which on this subject our law has mainly derived its principles.

So long as property wrongfully taken retains its original form and substance, or may be reduced to its original materials, it belongs, according to the admitted principles of the common law, to the original owner, without reference to the degree of improvement, or the additional value given to it by the labor of the wrongdoer. Nay more, this rule holds good against an innocent purchaser from the wrongdoer, although its value be increased an hundred fold by the labor of the purchaser. This is a necessary consequence of the continuance of the original ownership.

There is no satisfactory reason why the wrongful conversion of the original materials into an article of a different name or a different species should work a transfer of the title from the true owner to the trespasser, provided the real identity of the thing can be traced by evidence. The difficulty of proving the identity is not a good reason. It relates merely to the convenience of the remedy, and not at all to the right. There is no more difficulty or uncertainty in proving that the whisky in question was made of Wood's corn, than there would have been in proving that the plaintiff had made a cup of his gold, or a tool of his iron; and yet in those instances, according to the English cases, the proof would have been unobjectionable. In all cases where the new product can not be identified by mere inspection,

the original material must be traced by the testimony of witnesses from hand to hand through the process of transformation.

Again. The court below seem to have rejected the rule of the civil law applicable to this case, and to have adopted a principle not heretofore known to the common law; and for the reason that the rule of the civil law was too rigorous upon the wrongdoer, in depriving him of the benefit of his labor bestowed upon the goods wrongfully taken. But we think the civil law in this respect is in conformity not only with plain principles of morality, but supported by cogent reasons of public policy; while the rule adopted by the court below leads to the absurdity of treating the wilful trespasser with greater kindness and mercy than it shows to the innocent possessor of another man's goods. A single example may suffice to prove this to be so. A trespasser takes a quantity of iron ore belonging to another and converts it into iron, thus changing the species and identity of the article: the owner of the ore may recover its value, in trover or trespass; but not the value of the iron, because under the rule of the court below it would, be unjust and rigorous to deprive the trespasser of the value of his labor in the transmutation. But if the same trespasser steals the iron and sells it to an innocent purchaser, who works it into cutlery, the owner of the iron may recover of the purchaser the value of the cutlery, because by this process the original material is not destroyed, but remains, and may be reduced to its former state; and according to the rule adopted by the court below as to the change of identity the original ownership remains. Thus the innocent purchaser is deprived of the value of his labor, while the guilty trespasser is not.

The rule adopted by the court below seems, therefore, to be objectionable, because it operates unequally and unjustly. It not only divests the true owner of his title, without his consent; but it obliterates the distinction maintained by the civil law, and as we think by the common law, between the guilty and the innocent; and abolishes a salutary check against violence and fraud upon the rights of property.

We think, moreover, that the law on this subject has been

settled·by judicial decisions in this country.   In *Betts* v. *Lee*, (5 *John.* 349,) it was decided that as against a trespasser the original owner of the property may seize it in its new shape, whatever alteration of form it may have undergone, if he can prove the identity of the original materials.   That was a case in which the defendant had cut down the plaintiff's trees, and made them into shingles.   The property could neither be identified by inspection, nor restored to its original form; but the plaintiff recovered the value of the shingles.   So in *Curtis* v. *Groat*, (6 *John.* 169,) a trespasser cut wood on another's land and converted it into charcoal.   It was held that the charcoal still belonged to the owner of the wood.   Here was a change of the wood into an article of different kind and species.   No part of the substance of the wood remained in its original state; its identity could not be ascertained by the senses, nor could it be restored to what it originally was.   That case distinctly recognizes the principle that a wilful trespasser can not acquire a title to property merely by changing it from one species to another.   And the late Chancellor Kent, in his Commentaries, (*Vol.* 2, *p.* 363,) declares that the English law will not allow one man to gain a title to the property of another upon the principle of accession, if he took the other's property wilfully as a trespasser: and that it was settled as early as the time of the year books, that whatever alteration of form any property had undergone, the owner might seize it in its new shape, if he could prove the identity of the original materials.

The same rule has been adopted in Pennsylvania.   (*Snyder* v. *Vaux*, 2 *Rawle*, 427.)   And in Maine and Massachusetts it has been applied to a wilful intermixture of goods.   (*Ryder* v. *Hathaway*, 21 *Pick.* 304, 5; *Wingate* v. *Smith*, 7 *Shep.* 287; *Willard* v. *Rice*, 11 *Metc.* 493.)

We are therefore of opinion that if the plaintiffs below in converting the corn into whisky knew that it belonged to Wood, and that they were thus using it in violation of his right, they acquired no title to the manufactured article, which although changed from the original material into another of different nature, yet being the actual product of the corn, still belonged

to Wood. The evidence offered by the defendants and rejected by the circuit judge ought to have been admitted.

The right of Wood's creditors to seize the whisky by their execution is a necessary consequence of Wood's ownership. Their right is paramount to his, and of course to his election to sue in trover or trespass for the corn.

The judgment of the supreme court should be reversed and a new trial ordered.

GARDINER, JEWETT, HURLBUT and PRATT, Js. concurred.

BRONSON, Ch. J. Two very able arguments here, against the opinion which I delivered when the case was before the supreme court, (4 *Denio,* 332,) have only served to confirm me in the conclusion at which I then arrived. I shall add but little now to what I said on the former occasion.

The owner may, as a general rule, follow and retake the property of which he has been wrongfully deprived so long as the same thing remains, though it may have been changed in form and value by the labor and skill of the wrongdoer. But when, as in this case, the identity of the thing has been destroyed by a chemical process, so that the senses can no longer take cognizance of it—when it has not only changed its form and appearance, but has so combined with other elements that it has ceased to be the same thing, and become something else, the owner can, I think, follow it no longer : his remedy is an action for damages. Such I take to be the rule of the common law; and that is our law.

The rule for which the defendants contend, that in the case of a wilful trespass, the owner may follow and retake his property after it has been changed into a thing of a different species —that he may trace corn into whisky, and take the new product—is open to several objections. First : it would be nearly or quite impossible to administer such a rule in trials by jury. Second : the rule would often work injustice, by going beyond the proper measure of either redress or punishment; while an action for damages would render exact justice to both parties.

It is very true that a wilful trespasser should be punished: but that proves nothing. All agree that he should be made to suffer; but the mode and measure of punishment are questions which still remain. If one has knowingly taken six pence worth of his neighbor's goods as a trespasser, he should neither be imprisoned for life, nor should he forfeit a thousand dollars. We should not lose sight of the fact, that the rule now to be established is one for future, as well as present use; and it may work much greater injustice in other cases than it can in this. Third: there is no authority at the common law for following and retaking the new product in a case like this. I make the remark with the more confidence, because the very diligent counsel for the defendants, after having had several years, pending this controversy, for research, has only been able to produce some *dicta* of a single jurist, without so much as one common law adjudication in support of the rule for which he contends. He is driven to the civil law; and then the argument is, that because we, in common with the civilians, allow the owner to retake his property in certain cases, we must be deemed to have adopted the rule of the civil law on this subject in its whole extent. But that is a *non sequitur*. It often happens that our laws and those of the Romans—and, indeed, of all civilized nations—are found to agree in some particulars, while they are widely different in others; and this is true of laws relating to a single subject. There is no force, therefore, in the argument, that because our law touching this matter is to some extent like the civil law, it may be presumed that the two systems are alike in every particular. And clearly, the burden of showing that the Roman law is our law, lies on those who affirm that fact. There is not only the absence of any common law adjudication in favor of the rule for which the defendants contend, but in one of the earliest cases on the subject to be found in our books, (*Year Book*, 5 *H.* 7, *fo.* 15, 4 *Denio*, 335, *note*,) the court plainly recognized the distinction which has been mentioned, and admitted that the owner could not retake the property after its identity had been destroyed; and "grain taken and malt made of it" was given as an example.

Silsbury v. McCoon.

There are many cases where the title to a personal chattel may be turned into a mere right of action, without the consent of the owner, although the thing was taken by a wilful trespasser, or even by a thief. If a man steal a piece of timber, and place it as a beam or rafter in his house; or a nail, and drive it into his ship; or paint, and put it upon his carriage, the owner can not retake his goods, but is put to his action for damages; and this is so in the civil, as well as at the common law. If a thief take water from another's cistern, and use it in making beer; or salt, and use it in pickling pork; or fuel, and use it in smoking hams, I suppose no one will say, that the owner of the water, the salt or the fuel may seize the beer, the pork or the hams. And there is no better reason for giving him the new product, where sand is made into glass, malt into beer, coal into gas, or grain into whisky. In the case now before us, the civilians would not go so far as to say, that the owner of the grain might take the swine which were fattened on the refuse of the grain after it had gone through the process of distillation. And yet that would hardly be more unjust or absurd than it would be to give him the whisky. There must be a limit somewhere; and I know of none which is more safe, practical and just than that which allows the owner to follow a chattel until it has either been changed into a different species, or been adjoined to something else, which is the principal thing; and stops there. Thus far our courts have gone, and there they have stopped. We have neither precedent nor reason in favor of taking another step; and I can not take it.

Judge HARRIS agrees with me in the opinion that the judgment of the supreme court is right, and should be affirmed.

TAYLOR, J. did not hear the argument, and gave no opinion.

Judgment reversed.