WILLIAM LIGHTFOOT, Appellant, v. FITCH M. DAVIS, as Administrator with the Will Annexed of the Estate of WILLIAM BOWEN, Deceased, Respondent.

Personal property — Statute of Limitations — title to personal property, obtained by theft, cannot be acquired by lapse of time — equitable action to recover proceeds of bonds and income thereon against estate of person who purloined the bonds — action may be brought at any time within six years after discovery of identity of thief.

While title to personal property may be acquired by adverse possession, for a period which, under the Statute of Limitations, would bar an action for its recovery by the real owner, such possession must be under claim of right and open, public and notorious. But, where a person obtains possession of property secretly, by a common-law larceny and conceals that possession, the lapse of time cannot confer title on the thief.

Where bonds were stolen from the owner, together with the memorandum of their numbers and the description thereof, so that the owner was unable to stop payment or trace them, and, after the death of the owner's father in-law, there was found among his papers the memo-

randum which had been stolen with the bonds, and entries in his books, which showed that he had purloined the bonds and had collected the principal and interest thereof, the owner can maintain an action in equity, commenced upon the discovery of the identity of the thief, against his estate for the amount of the bonds and interest thereon from the time of the theft.

An action of conversion for the original taking of the bonds was barred by the Statute of Limitations, but under the Code of Civil Procedure (§ 382, subd. 5) an action in equity based on fraud, even where the jurisdiction in equity is only concurrent with that of law, may be brought at any time within six years after the discovery of the fraud. The fact that the ultimate relief sought is a money judgment does not take the case without the statutory provision.

The fact that the plaintiff failed to identify in the estate of the deceased the proceeds of the bonds does not deprive him of relief. He was still entitled to what would be a personal judgment were the original wrong-doer still living, for in equity it is the general rule " that the relief to be administered will be adapted to the exigencies of the case as they exist at the close of the trial." (*Matter of Cavin* v. *Gleason*, 105 N. Y. 256; *Matter of Hicks*, 170 N. Y. 195; *Bosley* v. *Nat. Machine Co.*, 123 N. Y. 550, distinguished.)

*Lightfoot* v. *Davis*, 132 App. Div. 452, reversed.

(Argued February 10, 1910; decided April 5, 1910.)

APPEAL from an order of the Appellate Division of the Supreme Court in the fourth judicial department, entered May 7, 1909, reversing a judgment in favor of plaintiff entered upon the report of a referee and granting a new trial.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Fletcher C. Peck* and *Charles Ward* for appellant. The decision of the Appellate Division holding that the six years' Statute of Limitations was a bar to a recovery by the plaintiff in this action was error. (*Anderson* v. *Nicholas*, 28 N. Y. 600.)

*Edwin A. Nash* and *George W. Atwell* for respondent. The six years' Statute of Limitations is a bar to a recovery by the plaintiff in this action. (Code Civ. Pro. §§ 380, 382; *Allen* v. *Miller*, 17 Wend. 202; *Burt* v. *Meyers*, 37 Hun, 277.)

CULLEN, Ch. J.  This is a singular case.  In March, 1875, and for some years previous the plaintiff had been the owner of several school bonds issued by various counties in the state of Kansas, aggregating in amount the sum of $4,000.  These, together with a memorandum stating the numbers and other details of the bonds, he kept locked in a bureau drawer.  At the time mentioned, during the plaintiff's absence, the drawer was broken open and the bonds abstracted by the defendant's testator, the plaintiff's father-in-law and a banker in the village of Lima in this state.  No suspicion seems ever to have attached to the deceased during his life.  The plaintiff made every effort to discover the bonds and who had purloined them.  The only record of their numbers was the memorandum taken with the bonds.  He was, therefore, unable to stop their payment or to trace them.  He had bought these bonds originally through the deceased, and immediately after their loss gave him notice of that fact.  In response the deceased wrote him : " I am going to Hamilton Station to-morrow.  If you will bring over all the records you have of the lost bonds I will look at them and will try and notify the districts of the loss and stop payment."  The plaintiff was never able to obtain any further information as to the bonds.  They matured within a few years and the interest as it accrued and the principal was collected by the deceased.  Upon his death in 1899 there was found among his papers the memorandum which had been stolen from the plaintiff, and an examination of his books showed that he had collected the bonds.  Upon the discovery of these facts, the plaintiff brought this suit against the defendant, as administrator with the will annexed of the deceased, praying judgment that the defendant " may account and pay over to him the amount of said bonds and the income thereof if it can be traced, and if it cannot be traced that he may have judgment against " the defendant as administrator for the sum of $16,000.  The answer denied any knowledge or belief as to the facts charged, and interposed both the six and ten years' Statute of Limitations.  The referee before whom the case was tried found all

the facts as hitherto recited, and awarded judgment to the plaintiff for the principal of said bonds and the interest thereon. The learned Appellate Division reversed the judgment on questions of law alone, leaving undisturbed the facts as found by the referee. It held on the authority of *Allen* v. *Mille* (17 Wend. 202) and *Burt* v. *Myers* (37 Hun, 277), that the plaintiff's claim was barred by the Statute of Limitations, despite his ignorance of the fact that the deceased had purloined the bonds.

The principle involved in this case is a far-reaching one. During the last thirty years there have been a number of bank robberies where by burglary very large amounts of securities have been stolen, and it has frequently proved impossible to detect the thieves or secure a return of the stolen property except in some cases by negotiations through "fences" or agents of the criminals. These securities are often, if not generally, long-time bonds not maturing until after the expiration of the six-year statutory period for bringing actions for conversion. If it be the law that a thief by avoiding detection and concealing the stolen property during that period may acquire title to the property or secure immunity from suit for its proceeds in case he has sold it, certainly we should call the attention of the legislature to the defect in the law in order that it might be remedied. In my opinion, however, since the adoption of the Code of Civil Procedure in 1876 the law is in no such unfortunate condition and appeal for legislative relief is unnecessary.

The first question to be considered is whether the lapse of time would have vested a good title in the defendant's testator had he remained in possession of the bonds until the time of his decease, for if such is the law, it is clear that he did not become liable because, instead of retaining the bonds, he collected the money due thereon. The law is settled in this state that while the Statute of Limitations may bar the remedy, it does not cancel or discharge the debt. (*Hulbert* v. *Clark*, 128 N. Y. 295.) This general doctrine is subject to the qualification that the statute may operate to transfer title to prop-

erty. Thus, in the case of our statutory provisions as to. the adverse possession of real property, the statute not only bars the remedy, but confers title on the party who has held the land adversely during the prescribed period. (*Baker* v. *Oakwood*, 123 N. Y. 16.) We have in our state, however, no statute relating to the adverse possession of chattels or personal property, nor do I know of any in any other state. Nevertheless, it seems to be the generally accepted doctrine that by adverse possession title to chattels may be acquired which will be paramount to that of the true owner. Though there are no decisions in our courts on the question they are numerous in other jurisdictions. (*Brent* v. *Chapman*, 5 Cranch, 358; *Layne* v. *Norris*, 16 Gratt. [Va.] 236; *Newby* v. *Blakey*, 3 Hen. & Mun. [Va.] 57; *Dagroo* v. *Cooper*, 72 Ky. [9 Bush.] 629; *Carr* v. *Barnett*, 21 Ill. App. 137; *Gaillard* v. *Hudson*, 81 Ga. 738; *Connor* v. *Hawkins*, 71 Tex. 582; *Chapin* v. *Freeland*, 142 Mass. 383.) In *Campbell* v. *Holt* (115 U. S. 620), in discussing the power of the legislature to revive an outlawed debt by repeal of the Statute of Limitations, Judge MILLER wrote: "Possession has always been a means of acquiring title to property. It was the earliest mode recognized by mankind of the *appropriation* of anything tangible by one person to his own use, to the exclusion of others, and legislators and publicists have always acknowledged its efficacy in confirming or creating title. The English and American statutes of limitation have in many cases the same effect, and, if there is any conflict in the decisions upon the subject, the weight of authority is in favor of the proposition that, where one has had the peaceable, undisturbed, open possession of real or personal property, with an assertion of his ownership, for the period which, under the law, would bar an action for its recovery by the real owner, the former has acquired a good title — a title superior to that of the latter, whose neglect to avail himself of his legal rights has lost him his title. This doctrine has been repeatedly asserted in this court. (*Leffingwell* v. *Warren*, 2 Black, 599; *Croxall* v. *Shererd*, 5 Wall. 268, 289; *Dickerson* v. *Colgrove*, 100 U. S. 578,

583; *Bicknell* v. *Comstock*, 113 U. S. 149, 152.) It is the doctrine of the English courts, and has often been asserted in the highest courts of the states of the Union." (p. 623.) This statement is cited in the opinion rendered in *Baker* v. *Oakwood* (*supra*), and though that case involved only the title to real property we accepted it as a correct exposition of the law. But none of the cases involved the power of a thief to acquire title by lapse of time where he had concealed the property. Judge MILLER speaks of a case where the possession is " Peaceable, undisturbed, open * * * with an assertion of his ownership," and it is apparent that if title to personal property may be acquired by possession in analogy to the acquisition of that to real property, that possession must have the qualifications stated. From the earliest period in our state it has been uniformly held that mere possession of real estate continued however long will not divest the owner of his property unless the possession is under a claim of title. Otherwise the possession will be presumed to be in subordination to the true legal title. (*Gansevoort* v. *Parker*, 3 Johns. Cas. 124; *Poor* v. *Horton*, 15 Barb. 485; *Doherty* v. *Matsell*, 119 N. Y. 646.) The nature of the possession required by the statute necessarily makes it open and public. In many of the cases cited from other states the fact that the defendant was a purchaser in good faith and his possession open and public is emphasized in the opinions of the courts. In *Dragoo* v. *Cooper* (*supra*) it was admitted that the defendants, who were purchasers of the property, acted in good faith. Judge LINDSAY said : " Dragoo does not acquire title to the horse in controversy by reason of Lewis's purchase from the thief, who could have no title, but by virtue of the possession under claim of title continuing in himself and Lewis for more than five years before the institution of the action." In *Newby* v. *Blakey* (*supra*) the judgment of the court was that the long and peaceable possession of the slaves in question, acquired without force or fraud, gave to Oswald Newby a legal title to them. In *Carr* v. *Barnett* (*supra*) the court said : " There was no concealment, fraudulent or otherwise, of his possession

and claim, but the facts were unknown to the plaintiff until a
short time before the suit was brought." In *Connor* v. *Haw-
kins* (*supra*) it was said : " Her (defendant's) possession was
adverse, public and continuous." In *Gaillard* v. *Hudson*
(*supra*) the court said : " The defendant to the possessory war-
rant, and those under whom he claimed, had been in the
peaceable, quiet and honest possession of this property for
more than four years next immediately preceding the issuing
of the warrant. They had bought the property and paid a
fair price for it."

At the same time it is declared, and the declaration con-
stantly reiterated in text books and decisions, that a thief can
acquire no title to the stolen property. (*Silsbury* v. *McCoon*,
3 N. Y. 379 ; *Bassett* v. *Spofford*, 45 id. 387.) If the acqui-
sition of personal property by adverse possession rests on
analogy to the law relating to real property — and that is the
ground on which it seems to rest — it is clear that the posses-
sion must be under claim of right, and open, public and
notorious. Where a person obtains possession of property
secretly by a common-law larceny and conceals that posses-
sion, no lapse of time should confer title on the thief. The
contrary doctrine seems to me shocking both in morals and
to common sense. Had the bonds remained in the possession
of the defendant's testator, the plaintiff, on discovering that
fact, might have recovered possession of them by legal process.
*Chapin* v. *Freeland* (*supra*) was an action of replevin for
two counters which had been affixed to the floor of a shop.
Afterwards, through the foreclosure of a mortgage, the prem-
ises were sold, the counters removed therefrom and subse
quently sold to the plaintiff. The defendant claimed to be
their original owner and took them from the plaintiff. Before
the defendant regained possession the Statute of Limitations
had run. There was no question of the plaintiff's good faith
or of his possession being public and known to the defendant.
It was there held that where the statute would be a bar to a
direct proceeding by the original owner, it could not be
defeated by indirection. " If he cannot replevy he cannot

take with his own hand. A title which will not sustain a declaration will not sustain a plea." Under the authorities we have cited it was properly held, I think, that as the defendant could not have regained it by legal process he could not resort to force to reclaim his property. The converse of the proposition seems to me equally true, that if the original owner has not by lapse of time lost title to the property, he is not barred from maintaining legal proceedings to recover possession of it.

We must now consider whether the plaintiff has lost his right to redress by the fact that the defendant's testator collected the money due on the bonds more than six years prior to the plaintiff's discovery of that fact and the institution of this action. That an action of conversion for the original taking of the bonds was barred by the statute is settled by authority. It was so held in *Allen* v. *Mille* (17 Wend. 202), which has never been overruled. Whether on discovery of the possession of the bonds by the defendant's testator the plaintiff might not have made a demand for their surrender and predicated a new conversion on that refusal, it is unnecessary to consider. But though a party may have lost one remedy by lapse of time, it is entirely possible that others may be open to him. In *Ganley* v. *Troy City Nat. Bank* (98 N. Y. 487) a married woman had deposited with the defendant two treasury notes under the following receipt:

"TROY, N. Y., *3d April,* 1865.

"Received this day of Margaret Ganley for safekeeping for her account two U. S. 7-30 treasury notes, $500 each, Nos. 166,338 and 9, to be delivered on surrender of this receipt.

"G. F. SIMS,

"*Cashier.*"

The notes matured in August, 1866, and at the request of the husband of Margaret Ganley, plaintiff's intestate, the bank sold the notes and paid the proceeds to him. In August, 1879, Margaret Ganley having died, her administrator brought the action to recover of the bank the amount collected on the

notes. One defense was the Statute of Limitations. The court held that though the action for trover was barred, the plaintiff could rely on the contract under which the bonds were deposited ; that the cause of action thereon did not arise until demand made and the tender of the receipt to the defendant, though long subsequent to the conversion, and that that claim was not barred. As to the prior conversion the court said : " In such a case a tort-feasor cannot allege his own wrong for the purpose of defeating an action upon the contract. In Angell on Limitations (5th ed. § 72) it is said : ' An action of assumpsit may not be barred by the statute, when, to an action for a tort upon the same demand, the statute may be pleaded.' Again, ' where there has been a tortious taking of his property, the injured party may bring trespass or trover, or he may waive both and bring assumpsit for the proceeds when it shall have been converted into money ; and if he choose the latter mode of redress, the tort-feasor cannot allege his own wrong for the purpose of carrying back the injury to a time which will let in the statute." (p. 494.)

Under the old Code (§ 91, subd. 6) it was prescribed : "An action for relief on the ground of fraud, in cases which heretofore were solely cognizable by the court of chancery, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud." Under this provision it was held that the only cases in which the running of the statute was postponed to the discovery of the facts constituting the fraud were those in which equity had exclusive jurisdiction. (*Foot* v. *Farrington,* 41 N. Y. 164.) The rule seems to have been the same under the Revised Statutes, where it was held that in actions to enforce constructive trusts the statute ran from the time of the fraud. (*Decouche* v. *Savetier,* 3 Johns. Ch. 190 ; Wood on Limitations, 413.) The case of *Burt* v. *Myers* (37 Hun, 277, *supra*) arose under the old Code, and it was, therefore, properly decided. But by the enactment of section 382, subd. 5 of the present Code, the law has been

radically changed, and since then an action in equity based on fraud, even where the jurisdiction in equity is only concurrent with that of law, may be brought at any time within six years after the discovery of the fraud. Nor does the fact that the ultimate relief sought is a money judgment take the case without the statutory provision. (*Carr* v. *Thompson*, 87 N. Y. 160; *Bosley* v. *Nat. Machine Co.*, 123 id. 550.) Therefore, the question is, was the plaintiff entitled to recover in an equitable action the relief which was awarded him by the referee.

Had the plaintiff been able to trace the proceeds of his bonds to the estate of the deceased, the right to recover would be clear. In *Newton* v. *Porter* (69 N. Y. 133), where negotiable securities were stolen and sold by the thief, it was held that the owner might follow and claim the proceeds in the hands of the felonious taker or his assignee with notice; that the law would raise a trust *in invitum* out of the transaction, and that the owner's right continued to attach to any securities or property in which the securities were invested so long as they could be traced and identified. Judge ANDREWS, after stating " when a person, standing in a fiduciary relation, misapplies or converts a trust fund into another species of property, the beneficiary will be entitled to the property thus acquired," thus answers the argument that the thief stood in no fiduciary relation to the property : " It is insisted by the counsel for the defendants that the doctrine which subjects property acquired by the fraudulent misuse of trust moneys by a trustee to the influence of the trust, and converts it into trust property and the wrongdoer into a trustee at the election of the beneficiary, has no application to a case where money or property acquired by felony has been converted into other property. There is, it is said, in such cases, no trust relation between the owner of the stolen property and the thief, and the law will not imply one for the purpose of subjecting the avails of the stolen property to the claim of the owner. It would seem to be an anomaly in the law, if the owner who has been deprived of his property by larceny should be less

favorably situated in a court of equity, in respect to his remedy to recover it, or the property into which it had been converted, than one, who, by an abuse of trust, has been injured by the wrongful act of a trustee to whom the possession of trust property has been confided. The law in such a case will raise a trust *in invitum* out of the transaction, for the very purpose of subjecting the substituted property to the purposes of idemnity and recompense." (pp. 138, 139.) The same learned judge said, in *American Sugar Ref. Co.* v. *Fancher* (145 N. Y. 552, 558): "The jurisdiction of courts of equity in cases of trust or agency, or cases of like character, it is insisted, is founded upon the ancient jurisdiction of these courts over trusts and fiduciary relations, and has not been and ought not to be extended beyond these cases. It is very true that trusts and trust relations are peculiarly cognizable in equity, and have been so cognizable from the earliest period of equitable jurisprudence. But it is to be said that these are but branches of the larger jurisdiction over frauds, which equity abhors, and of which it has cognizance admittedly in many cases not connected with technical trusts or agency."

*Holmes* v. *Gilman* (138 N. Y. 369) is to the same effect. There a partner had embezzled funds of the firm and had taken out with such funds insurance policies on his life in favor of his wife, and had abstracted further funds to continue the payments of the annual premiums. The partner having died, it was held that all the moneys payable under the insurance policies, though in excess of the amount abstracted, in equity, belonged to the firm. Judge PECKHAM there said: "In case the trustee took a thousand dollars of trust funds and five hundred of his own, and purchased property which advanced in value to twice its original sum, I have seen no case where the point has been determined that the whole increased value belongs to the trustee, and that only the original sum taken and interest can be given to the *cestui que trust,* although it was by reason of the wrongful use of the trust funds that the trustee was enabled to realize such value." (p. 378.) The method by which equity proceeds in all these cases is to

turn the wrongdoer into a trustee. If it may do so for the purpose of subjecting identified funds to the claim of the defrauded party, I do not see why it should not pursue the same method wherever it is necessary to protect the rights of the original owner. In the case of an actual trustee, the *cestui que trust* may not only reclaim the trust property if he is able to trace it, but failing to trace it, he is entitled to an accounting and personal judgment against the trustee. (3 Pomeroy's Eq. Juris. § 1058.) If in the *Holmes* case the insurance moneys had been squandered or lost before the action was commenced, I cannot see why the plaintiffs should be deprived of remedy or why equity should not retain the case for the award of a personal judgment. It is true that while equity has a most comprehensive jurisdiction over cases of fraud, it is not in every such case that it will exercise that jurisdiction. (1 Pomeroy's Eq. Juris. § 188; 2 id. § 914 *et seq.*; Bispham's Eq. § 200.) So, ordinarily, a party would be remitted to his action at law to recover damages for deceit or fraudulent representations, though even in such a case he might obtain relief in an action in equity to rescind. (*Gould* v. *Cayuga Co. Nat. Bank*, 86 N. Y. 75.) Nor ordinarily will equity entertain an action to recover damages for trespass or trover. (*U. S.* v. *Bitter Root Development Co.*, 200 U. S. 451.) In the case cited, however, the court took occasion to say that while there were found in the bill general characterizations of the defendant's acts as fraudulent, no specific allegations of fraud were stated, and the case was merely a common one of trover or trespass.

In cases like the one before us there are two distinct elements of fraud — 1st, the original larceny; 2nd, the subsequent concealment of the stolen property and of its sale and the receipt of its proceeds. Assuming (but only for the argument) that under the first no bill in equity could be maintained, I think the second affords a good ground for the interposition of equity, and, as already stated, though the plaintiff failed to identify in the estate of the deceased the proceeds of his bonds, he was still entitled to what would

be a personal judgment were the original wrongdoer still living, for in equity it is the general rule "that the relief to be administered will be adapted to the exigencies of the case as they exist at the close of the trial." (*Spears* v. *Mayor, etc., of N. Y.*, 87 N. Y. 359, 376; *Dammert* v. *Osborn*, 140 id. 30, 43; *Sanders* v. *Soutter*, 126 N. Y. 193, 201.) Cases of the character of the one before us are to be distinguished from that large class, often those of principal and agent, in which it is held that an accounting in equity will not lie, and that the accounting must be had in an action at law. In such cases there exists merely a debt from one party to the other, while in those of the former class, the property or fund itself belonging to the claimant, he is entitled to follow the proceeds as long as he may be able to identify them, or failing that, to recover not only the amount of the fund, but also any profits acquired by its wrongful appropriation.

There remain to be considered certain authorities which may be cited in opposition to the views which I have expressed. In *Matter of Cavin* v. *Gleason* (105 N. Y. 256) and *Matter of Hicks* (170 id. 195) the claimants were defeated, having failed to identify their funds in the estate. One was the case of the estate of an insolvent, and the other that of a deceased person. In both of these cases the sole attempt was to gain a preference over other creditors; not to establish a claim against the estate. This is the vital distinction between those cases and the one before us. *Bosley* v. *Nat. Machine Co. (supra)* was an action against a corporation and its promoters to cancel a subscription for the stock of the corporation on the ground that it was obtained through fraud and misrepresentation, and to recover the money paid thereon not only from the corporation but from the agent of the company who made the fraudulent representations. This court said that no equitable cause of action was set forth against the individual defendant, but as the exception taken to the decision of the trial court was a joint one by the corporation and the individual defendant, the latter could not avail himself of that exception on appeal. The statement that no equitable action

18

lay against the individual defendant was, therefore, in reality *obiter* and must be considered as overruled by the decision in *Mack* v. *Latta* (178 N. Y. 525), where this court expressly held that an equitable action would lie against the agents and promoters of a corporation as well as the corporation itself. In this connection attention may be called to *Bosworth* v. *Allen* (168 N. Y. 157), where it was held that the directors of a corporation, while not technically trustees, were liable in equity to account the same as ordinary trustees for their conduct in the management of the corporation, and for the moneys they had received as a consideration for the turning over the control of the corporation to third parties. The case seems to be a clear authority for the proposition that a constructive trustee may be compelled to account in equity in the same manner as an actual trustee.

I think the order of the Appellate Division should be reversed and the judgment of the trial court affirmed, with costs in both courts.

Haight, Vann, Werner, Willard Bartlett, Hiscock and Chase, JJ., concur.

Order reversed, etc.