(3 App. Div. 91.)

### McKECHNIE et al. v. McKECHNIE et al.

(Supreme Court, Appellate Division, Fourth Department. March 14, 1896.)

1. ATTORNEY AND CLIENT—POWER OF ATTORNEY TO COMPROMISE CLAIMS.
    An attorney employed to foreclose a mortgage has no implied power to compromise the rights of his clients by an agreement that they will hold the premises as mortgagees in possession and account for the rents and profits.

2. EQUITY—STALE DEMANDS.
    An action to redeem from a mortgage will not be entertained where defendants and their testators have been in undisputed possession of the mortgaged premises for more than 33 years, claiming to be the owners thereof.

Appeal from special term, Ontario county.

Action by Jane McKechnie and others against John D. McKech-nie, as surviving executor of the will of Alexander McKechnie, deceased, and others, to obtain possession of certain real estate located at Palmyra, N. Y., and that the possession of defendants and their testators be declared to be that of mortgagors in possession, and to compel defendants to account for the rents and profits of said real estate during the years they and their testators were in possession. From an interlocutory judgment in favor of plaintiffs, defendants appeal. Reversed.

Robert McKechnie became the owner of the premises about the year 1837. On April 27, 1852, he and his wife conveyed the premises to his brothers, James McKechnie and Alexander McKechnie, for a consideration of $2,500. On October 22, 1856, James McKechnie and wife and Alexander McKechnie and wife conveyed the premises to Robert McKechnie for a consideration of $3,000. Robert paid no part of the consideration, but on the same day executed a mortgage to James and Alexander to secure the purchase money. The mortgage was conditioned for payment of interest on October 22d in each year, and that the principal sum should immediately become due in case of default in payment of interest for 30 days. On December 22, 1857, Robert McKechnie gave a quitclaim deed of the premises to Pomeroy Tucker, and on the following day Tucker gave a quitclaim deed to plaintiff Jane Mc-Kechnie, both of which were duly recorded. Robert McKechnie died intestate on March 11, 1858, leaving, him surviving, plaintiff Jane McKechnie, his wife, and Mary McKechnie, John A. McKechnie, and Lizzie McKechnie, his children, as his only heirs at law. Lizzie McKechnie died intestate before the commencement of the action. On April 14, 1858, James and Alexander McKechnie proceeded to foreclose the mortgage by advertisement, and the proceedings were prosecuted to a sale, and the mortgagees became the purchasers for the amount due on the mortgage, and entered into possession of the premises. Alexander McKechnie died on January 28, 1883, and James McKechnie died on September 12, 1889. Defendant John D. McKechnie is the sole surviving executor of the will of Alexander McKechnie, and defendant Bacon is the sole surviving executor of the will of James McKechnie.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, WARD, and GREEN, JJ.

Frank Rice and Henry M. Field, for appellants.
James C. Smith, for respondents.

FOLLETT, J. From July 10, 1858, the date of the sale under the mortgage foreclosure, to October 15, 1891, the date of the commencement of this action, a period of more than 33 years, the defendants and their testators have been in the undisputed possession of the mortgaged premises, claiming to be the owners thereof, and enjoying all of the rights of proprietorship. Each of the defendants interposed, in addition to defenses on the merits, the defense that the cause of action alleged in the complaint was barred by the ten and twenty years statute of limitations.

During all of these years, Jane McKechnie, plaintiff, has been of full age and under no legal disability. Mary McKechnie, plaintiff, became 21 years of age October 9, 1869, and for 22 years before the commencement of this action has been of full age and under no legal disability. February 14, 1872, John A. McKechnie, plaintiff, became 21 years of age, and for 18 years before the commencement of this action has been of full age and under no legal

disability. The litigants have been, during this period, residents of the village of Canandaigua, which is only 13 miles from the village of Palmyra, the place where the mortgaged property is situated.

Prior to September 1, 1877, when chapter 4 of the Code of Civil Procedure took effect, an action to redeem land from the lien of a mortgage brought against a person in possession claiming title in hostility to the mortgagor was barred after such possession had continued for 10 years. Miner v. Beekman, 50 N. Y. 337; Hubbell v. Sibley, Id. 468. By section 379 of the Code of Civil Procedure, which took effect September 1, 1877, the time in which such action might be brought was extended to 20 years. By section 101 of the Code of Procedure and by section 396 of the Code of Civil Procedure the time in which infants may sue is extended one year after they become of age. Under both Codes, the cause of action set forth in the complaint is barred, unless it is established that the possession of the defendants and of their testators has not been hostile to the title of the mortgagor and to his successors in interest. The learned trial court found that defendants' testators entered into possession of the premises, and continued therein as mortgagees, and not as owners, under a promise, made through James Peddie, their attorney, to the plaintiff Jane McKechnie, that the proceeds of the premises over and above necessary and reasonable charges and expenses should be applied to the support of herself and children, and that the promise was authorized by the mortgagees, who afterwards recognized and ratified it. This is the only finding relied on by the plaintiffs to take this case out of the operation of the statute, which finding is challenged by the defendants as contrary to the weight of evidence.

It is conceded by the learned counsel for the respondents that there is no legal evidence of an express promise by the defendants' testators to hold the premises as mortgagees in possession and account for the rents and profits, and the only evidence tending to show that Jane McKechnie ever believed in the existence of such a promise was given by her. She testified that, in June, 1858, before she left the premises, James Peddie, the attorney who foreclosed the mortgage, called on her, and the following conversation occurred:

"Q. I [plaintiffs' counsel] only want to know what the conversation was. * * * A. He [James Peddie] came to tell me that James McKechnie said that he was not going to settle my husband's business as he had promised him to. He thought I was not to make myself at all uneasy about the business because it was going to be thrown altogether, and I would be well supported out of the business. As he was leaving, he stopped at the door, and he said: 'Don't make yourself at all uneasy. You are to be well supported out of this business.' Mr. James told him so. * * * Q. I understood you to say that Mr. Peddie told you that James McKechnie told him to come and tell you that? A. Yes, sir. Q. Did you make any reply to him? * * * A. Yes, sir. Q. Did you tell Mr. Peddie what James had told you? A. Yes, sir. Q. Will you state what you told Peddie that James had said to you? A. I told Peddie that James told me that Mr. Peddie would come and tell me all about the business. I had spoken to James and— Q. I only asked for what you told Mr. Peddie. A. Yes, sir."

An attorney employed to effect a statutory foreclosure of a mortgage has no implied power to compromise the rights of his client, or to nullify the act which he is employed to perform; and, before the defendants can be bound by the promise of Peddie, it must be shown that he was expressly authorized to make the promise. Lewis v. Duane, 141 N. Y. 302, 36 N. E. 322, affirming 69 Hun, 28, 23 N. Y. Supp. 433. There is no evidence that James Peddie had any authority to make such a promise. It appears that, at this time, he was engaged in foreclosing the mortgage, which proceedings were begun April 14, 1858. His former partner, called by the plaintiffs, testified that he could not say that James Peddie was the agent for J. & A. McKechnie in any way,— was simply an attorney for them in legal matters which they had in Palmyra. He did not know that Peddie had any charge of the brewery property, and, so far as he knew, his employment related to the brewery business, debts, and accounts. This falls far short of showing that Peddie was vested with authority to make the promise testified to by Jane McKechnie. On the contrary, it tends to show that he had no such authority.

It is argued, in behalf of the plaintiffs, that the subsequent dealings between J. & A. McKechnie and the plaintiffs tend to support the findings that such a promise was made, and that by such dealings it was ratified. I am unable to find any support in the evidence for this contention. During these 33 years, none of the plaintiffs, so far as the record shows, took the slightest interest in the Palmyra Brewery. Had there been an agreement that the mortgage and interest thereon, the taxes and expenses of managing the brewery, and the value of the goods and the house rent furnished were to be charged on one side, and the rents and profits on the other side, of a mutual account, it seems to me there would have been some entry in the books denoting such an understanding, or, at least, that these plaintiffs, or some of them, during these years, would have taken some steps to ascertain the state of the accounts and the condition of the property. If such an agreement had been made and acted on by the parties, it is altogether unlikely that John A. McKechnie would have been ignorant in respect to it. He was the only son, and lived with his mother and sister. At the time of the trial of this action he was 43 years of age, and, as he testified, a man of property. The first conversation he ever had with either of the defendants in respect to the Palmyra Brewery was in April, 1890, when Orin S. Bacon, the executor of James McKechnie, stated that thereafter he would have to pay rent for the house which he and his mother had occupied for so many years. John A. McKechnie testified that the mortgage was then spoken of by Bacon, but John A. McKechnie did not then assert that he knew of its existence, or that he and his mother and sister had a right to redeem the property. As before stated, from October, 1858, to September, 1865, J & A. McKechnie supplied the plaintiff with a house, fuel, and groceries. From September, 1865, until April 5, 1884, the family occupied the house free of rent, and received $25 per month in cash. January 28, 1883, Alexander Mc-

Kechnie died. John A. McKechnie testified that, when the money payments were stopped, in April, 1884, Alexander McKechnie's executor told him they would not get $25 per month thereafter, and said that he (John A. McKechnie) must take care of his mother, and that James McKechnie, the surviving member of J. & A. McKechnie, would take good care of the sister, Mary McKechnie. No steps were then taken to 'assert any rights in the Palmyra property, and no claim was made that payments were due the plaintiffs on account of that property. The plaintiffs continued to occupy the house, without the payment of rent, until September. 12, 1889, when James McKechnie died, leaving a will giving legacies to John A. and Mary McKechnie, two of these plaintiffs. Whether James McKechnie did or did not care for Mary up to the time of his death, pursuant to the promise, does not appear. She was not a witness on the trial. April 1, 1890, the executor of Alexander McKechnie conveyed the interest of that estate in the house, which then was, and for so long had been, the home of the plaintiffs, to the executor and trustees of James McKechnie. Jane McKechnie testified that, in October, 1890, Mr. Bacon, the executor of James, told her she would have to pay rent for the house. She described the conversation as follows:

"Mr. Bacon told me that I would have to pay rent for the place I was living in. I thought it very strange that I should be asked for rent for the place, and I told Mr. Bacon that, if I had to pay rent, I should have to look out for something to pay it with; that I hadn't a dollar of my own, and I thought I had something in the Palmyra property left for me. And Mr. Bacon told me that was outlawed. And I said: 'Why isn't this outlawed?' 'This was an entirely different thing,' he said. And I couldn't understand it, and I asked him if the law was made to protect the rich man's thousands and steal the widow's mite; Mr. Bacon was standing at the outside of the door at the time, and there was nothing more said. The house I was then living in was the house next to the house I am living in now,—the very next door. * * * They certainly knew I had nothing to pay rent with, unless I looked something up to pay it with."

Bacon denied that he ever had such a conversation with Jane McKechnie. It is insisted, in behalf of the plaintiffs, that the fact that the goods which J. & A. McKechnie furnished them were charged on the books of the firm establishes the plaintiffs' theory that the defendants' testators did not take possession of and occupy the premises, claiming title thereto, but were in possession as mortgagees, recognizing the title of the plaintiffs. I think the accounts do not tend in any way, under the circumstances of this case, to establish the plaintiffs' claim. Payment for these goods was never demanded. No account was ever presented, and the fact that they were charged simply indicates that they were entered for the purpose of showing how much was furnished this family, and to keep an account of the expenses of the firm.

The plaintiffs concede that the amount furnished by the firm, in goods, rent, and money, exceeded $7,000. It seems very plain to me that the whole course of the dealing of the firm with their brother's widow and children establishes the fact that they were dealing generously, and not deceitfully, with them. The finding that the defendants' testators entered into possession of the brew-

ery property under an agreement to account for the rents and proceeds, and to hold it as mortgagees in possession, is wholly unsustained by the evidence. December 22, 1857, Robert McKechnie quitclaimed the brewery property to Tucker, who, on the next day, quitclaimed it to Jane McKechnie. Both of these deeds were recorded June 30, 1859. When Jane McKechnie was under examination, she was asked by her counsel:

"Q. Had you ever any knowledge, prior to the 26th day of June, 1859, of the existence of such a deed? A. No, I did not."

This was four days before the two deeds were placed on record. What knowledge she then acquired, from whom, or what directions, if any, she gave in respect to the deeds, is not disclosed. During all of these years she knew of those deeds, and took no action to enforce the rights now asserted in behalf of herself and children in the premises. These deeds and the bills of sale of the brewery property were executed within two weeks of each other, and were undoubtedly given by Robert McKechnie to divest himself of the title to the real estate and fixtures. What exigency caused these conveyances to be executed does not appear. These deeds are ancient ones, for more than 30 years on record, and the presumption is that they were duly executed and delivered, which was not rebutted by the bare statement of this interested witness that she had no knowledge of them prior to June 26, 1859.

In addition to these deeds, the affidavits of the foreclosure of the mortgage have been a matter of record since June 30, 1859, and, if the title was in Jane McKechnie, the title under the foreclosure is perfect. The affidavits show that Jane McKechnie, the grantor under these deeds, was personally served with the notice of sale. It is true that she denies that she was so served, but, as against her testimony, is the affidavit of the attorney who affected the foreclosure, made in the usual way, and placed on record. He knew of the existence of these deeds, for they were acknowledged before him, and it seems to me highly improbable that the attorney willfully and without any motive, so far as it appears, committed perjury, and placed the evidence thereof on record while the person injured thereby was living. If we assume that his affidavit is false, we must also assume that James and Alexander McKechnie, his employers, were engaged in a scheme to defraud the widow and children of their brother out of their estate, and that the attorney was their instrument. The subsequent conduct of James and Alexander McKechnie, from that time down to the times of their deaths, shows that they were not engaged in such a conspiracy. The sale of these premises was advertised to be made July 10, 1858, at an hotel in the village of Palmyra, where Jane McKechnie resided at the time, and the premises were sold on the day and at the place mentioned by public auction. This village then had less than 2,000 inhabitants, and it is difficult to believe that Mrs. McKechnie did not know about the sale, and Peddie could not have hoped that his perjury, if perjury he committed, would remain undiscovered. The finding that these deeds were not delivered, and that the notice of sale was not

served, is, to my mind, clearly contrary to the weight of evidence.

This is a very stale demand, and it has long been a rule of the courts of equity that such demands will not be enforced. "Courts of equity aid the vigilant and not the indolent." This maxim was expressed by Lord Camden in Smith v. Clay, 3 Brown, Ch. 640, note, as follows:

"A court of equity, which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept upon his right and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence."

This is a well-settled rule of equity. Snell, Eq. (9th Ed.) 41; Pom. Eq. Jur. § 418; Wood, Lim. § 60. The plaintiffs have shown no reasonable excuse for sleeping on their alleged rights for a third of a century, and until after nearly all of the actors in the transactions out of which this action arose have died. Legal titles, which have been of record and supported by undisputed possession for more than a generation, should not be overthrown by evidence of such little probative force as that which is contained in the record before us. The judgment should be reversed, and a new trial granted, with costs to abide the final award of costs.

Interlocutory judgment reversed, and a new trial ordered, with costs to abide the final award of costs. All concur, except ADAMS, J., not voting.