(169 App. Div. 395)

.KELLOGG v. KELLOGG.

(Supreme Court, Appellate Division, Fourth Department. October 13, 1915.)

1. LIMITATION OF ACTIONS ⬨➥103—EXISTENCE OF TRUST—EXECUTORS.

 An executor occupies a trust relation towards those entitled to the estate, irrespective of the provisions of the will, and limitations do not run in his favor until a disavowal of the trust by him.

 [Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. § 539; Dec. Dig. ⬨➥103.]

2. TRUSTS ⬨➥95—CONSTRUCTIVE TRUSTS—FRAUD.

 If, as claimed, various transactions to which an executor and his wife were parties were fraudulent, and enabled her to obtain large portions

⬨➥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of the estate without consideration, or for a grossly inadequate considera-
tion, she might be charged as a constructive trustee.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 145–147; Dec.
Dig. ☞95.]

3. LIMITATION OF ACTIONS ☞100—DISCOVERY OF FRAUD—DILIGENCE.

An administrator with the will annexed owed no active duty to discover
a fraud whereby the wife of a former executor was enabled to obtain por-
tions of the estate without consideration, or for a grossly inadequate con-
sideration.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig.
§§ 323, 480–493; Dec. Dig. ☞100.]

4. LIMITATION OF ACTIONS ☞100—DISCOVERY OF FRAUD—KNOWLEDGE OF
FACTS.

Under Code Civ. Proc. § 382, subd. 5, providing that an action to pro-
cure a judgment other than for a sum of money on the ground of fraud,
in a case which on December 31, 1846, was cognizable by a court of chan-
cery, must be commenced within 6 years, and that the cause of action
in such case is not deemed to have accrued until the discovery by plain-
tiff, or the person under whom he claims, of the facts constituting the
fraud, knowledge of facts from which the inference of fraud follows
amounts to a discovery of the facts constituting the fraud, though the de-
frauded party does not actually draw the inference.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig.
§§ 323, 480–493; Dec. Dig. ☞100.]

5. LIMITATION OF ACTIONS ☞197—DISCOVERY OF FRAUD—EVIDENCE.

Where various transactions claimed to have been fraudulent, and to
have enabled the wife of an executor to acquire property of the estate
without consideration, or for an inadequate consideration, began in the
early 50's and were included within the next 30 years, and the various
transfers of real property were matters of common knowledge and large-
ly the subject of public record, and various litigations claimed to evidence
the fraud were also matters of public record, and after the death of the
executor, in 1883, three administrators with the will annexed were suc-
cessively appointed, who employed attorneys to investigate the status of
the estate and the details thereof, and the attorneys made such investi-
gations, the inference was reasonable that the facts claimed to support
findings of fraud were discovered, and a finding as to nondiscovery of the
fraud until within 6 years prior to the bringing of an action for an ac-
counting in 1912, which finding was not based upon any direct evidence,
but was sought to be supported by all the circumstances of the case, was
not well founded.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig.
§§ 722–726; Dec. Dig. ☞197.]

6. TRUSTS ☞365—ACTIONS FOR ACCOUNTING—LACHES.

Where transactions claimed to have been fraudulent, and to have en-
abled the wife of an executor to acquire property of the estate without
consideration, or for a grossly inadequate consideration, commenced in
the early 50's, and were included within the next 30 years, and, though
attention was directly and publicly drawn by litigations and public rec-
ords to the improvident management of the estate and the insolvency of
the executors, no effort was apparently made to liquidate the estate and
determine it, throughout the years elapsing since accurate proof of the
facts was available, and the executor and his wife, as well as other wit-
nesses, had in the meantime died, so that there was practically no proof,
except such as might be gleaned from ancient records, documents, etc., a
suit against the wife's administrator for an accounting, brought in 1912,
was barred by laches, even assuming that the wife became subject to the
same trust as the executor, and that limitations would not run in her

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

favor, since, when parties have slept upon their rights for so long a
time as to render uncertain the equity of the result sought, and by rea-
son of the death of witnesses and parties it is extremely difficult to de-
termine the actual facts, equity will deny relief.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 568–573; Dec.
Dig. ☞365.]

7. JUDGMENT ☞251—PLEADING—LACHES—NECESSITY OF PLEADING.

Where, in a suit in equity, the staleness of plaintiff's claim necessarily
appears upon the proof of his case, it may be availed of by the court in
the final relief to be decreed, though laches is not pleaded, as the re-
lief to be administered in equity will be adapted to the exigencies of the
case as they exist at the close of the trial.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 437; Dec. Dig.
☞251.]

Appeal from Trial Term, Onondaga County.

Action by Thomas C. Kellogg, as administrator with the will an-
nexed of Daniel Kellogg, deceased, against John L. Kellogg, as admin-
istrator de bonis non of Paulina W. Kellogg, deceased. From a judg-
ment in favor of plaintiff for $236,089.12, and from an order allowing
plaintiff an extra allowance for costs, defendant appeals. Reversed,
and complaint dismissed.

Argued before KRUSE, P. J., and ROBSON, FOOTE, LAM-
BERT, and MERRELL, JJ.

John D. Teller, of Auburn, for appellant.
C. W. Andrews, of Syracuse (George Barrow, of Skaneatles, of
counsel), for respondent.

LAMBERT, J. This action is for accounting, upon the theory that
Paulina W. Kellogg, the defendant's intestate, died seised of certain
properties belonging to the estate of Daniel Kellogg, plaintiff's testa-
tor, which properties, in whole or in part, or the proceeds of same,
are now in the possession of defendant. Daniel Kellogg, plaintiff's
testator, died May 4, 1836, and was survived by four sons and three
daughters, and by his wife, Laura Kellogg. He left a will, of which
he appointed his son, John Kellogg, George F. Leitch, and David H.
Comstock as executors. For a time the executor George F. Leitch
seems to have been in active charge of the estate. Eventually, however,
his health having failed, and Comstock having removed to New York,
the active management of the estate devolved upon the son, John.
Finally, both Leitch and Comstock having died, John Kellogg con-
tinued to act as sole executor until his death, February 7, 1883. Fol-
lowing the decease of John Kellogg, one D. Kellogg Leitch was ap-
pointed administrator of the estate with the will annexed, and served
in that capacity until his death, May 29, 1891. Daniel Kellogg, a son
of the testator, was next appointed administrator of the estate, and
served until his death, July 21, 1892, at which time plaintiff was ap-
pointed as such. There has never been any judicial settlement of this
estate. John Kellogg was survived by his wife, Paulina, who died De-
cember 20, 1908, intestate. George B. Longstreet was appointed ad-
ministrator of her estate, and acted as such until the completion of

the trial and submission of this case, when he died, and the defendant was appointed administrator, substituted in the action, and continued the same in his name.

The Daniel Kellogg estate, in gross, amounted to several hundreds of thousands of dollars. Each of the children of the testator participated therein. John, the executor, received a $28,000 bequest, and was also named as one of the residuary legatees. $24,000 was given to the executors in trust to pay the income to the daughter Mary Ann Converse, with the remainder to her children. $25,000 in like manner was bequeathed in trust for the benefit of the daughter Sally Maria Kellogg, with the remainder to her children. In like manner $25,000 was bequeathed in trust for the daughter Catherine K. Leitch, with the remainder to her children. April 26, 1912, the plaintiff filed a claim for $75,000 against the defendant estate, founded upon the facts upon which judgment has been rendered. That claim was rejected May 14, 1912, and this action was brought August 31, 1912. Pending the determination of the action, plaintiff's application to amend the complaint by increasing the demand for judgment was granted, and judgment for the plaintiff for $236,089.12 has been rendered.

Interwoven with the Daniel Kellogg estate is the estate of one David Hyde, in connection with which latter estate arise many of the matters affording claimed support for the judgment appealed from. David Hyde was a brother of the wife of Daniel Kellogg. He died in 1824, leaving a will, in which he named Daniel Kellogg as executor. That will created a trust in the executor as trustee, for the benefit of a daughter, Chloe Hyde, during her minority, the remainder then to be paid to her, or under certain contingencies $10,000 of it to be paid to the Theological Seminary at Auburn, N. Y. Chloe Hyde was taken into the family of Daniel Kellogg during her minority. She was residing there at the time of her majority in August, 1837, and continued her residence at that home until her death, May 31, 1850. She died intestate and without issue, and there has never been any judicial settlement of her estate. In 1847 it appears that George F. Leitch, one of the executors of Daniel Kellogg's will, was largely indebted to the Kellogg estate, and that Daniel Kellogg's estate was largely indebted to either the estate of David Hyde or to Chloe Hyde, under the trust created by David Hyde's will. In August, 1848, at the solicitation of John Kellogg, Leitch executed a conveyance to Chloe Hyde of various real property in Auburn and in Syracuse, by deeds which expressed a consideration of $21,000 for the Auburn property and $26,000 for the Syracuse property, aggregating some $47,000. The referee has found that Chloe Hyde was induced to accept that conveyance as a payment upon the bequest owing her by the Daniel Kellogg estate, by reason of the representations of John Kellogg that it was advantageous, inasmuch as the indebtedness was in jeopardy. It is further found that she believed these lands to be clear of incumbrances; that she accepted the conveyance and gave her receipt to John Kellogg as executor for $47,000 on account of the legacy to her under her father's will. It is further found that these lands unincumbered were scarcely worth $47,000; that in fact they were then incumbered for more than half of their actual value.

Upon the death of Chloe Hyde, and on May 29, 1851, letters of administration upon her estate were granted to one Almeron H. Cole, who acted in that capacity until October 14, 1859, when he died, and Dan'H. Cole was appointed in his stead. Among the heirs at law of Chloe Hyde was one Christiana Beach, who, in 1851, conveyed to Almeron H. Cole all her claimed one-fourth interest in the real and personal estate of Chloe Hyde, including the Syracuse and Auburn lands conveyed by Leitch. Among the lands conveyed to Chloe Hyde by Leitch in Syracuse was a property known as the Exchange Building. This property was incumbered by a mortgage theretofore given by Leitch, and in August, 1850, that mortgage was placed in foreclosure judgment, and the lands were sold and were bid in by Almeron Cole for $10,200, the moneys for which were furnished by the executors of the Daniel Kellogg estate, from that estate. It is also found that at that time the executors of Daniel Kellogg held a second mortgage on this property for some $20,000, which mortgage had been some time theretofore given to Leitch and assigned by him to the executors. At about the same time a mortgage prior to the Leitch title upon other Syracuse property, known as the Bradley house and lot (also a portion of the lands conveyed by Leitch to Chloe Hyde), was foreclosed, and this title was bid in by Almeron Cole for $1,255.72, which moneys were also furnished by the executors of Daniel Kellogg, and upon this property such executors likewise held a second mortgage.

September 15, 1851, at which time Leitch and Comstock had ceased active management of the Daniel Kellogg estate, John Kellogg, as executor, entered into a written agreement with Almeron Cole, as administrator of the Chloe Hyde estate, to the effect that the Daniel Kellogg estate should bid in and assign to Cole, as such administrator, all the claims against the title conveyed by Leitch to Chloe Hyde, which were outstanding at the time of that conveyance, and should satisfy all claims of the Kellogg estate against Cole as administrator, and against such real property; and Cole agreed that, in consideration therefor, the receipt theretofore given by Chloe Hyde for $47,000 should stand as a valid receipt for that amount on account of the legacy to her under her father's will. Eventually, this contract was fully performed, at an expense to the estate of over $34,000. This adjust· ment also satisfied all claim of the estate of Daniel Kellogg for moneys advanced to Cole, with which to make the purchases in the two mortgage foreclosures, above referred to. January 1, 1852, John Kellogg, as executor, and Almeron H. Cole, as administrator of Chloe Hyde's estate, entered into a contract, specifying and extinguishing various claims, and fixing and determining the balance due to the Chloe Hyde estate from the Kellogg estate at the sum of $50,000, with interest from November 1, 1851. It was distinctly provided that this contract did not abrogate or affect the preceding contract of September 15, 1851. It seems that Cole never applied any of the real estate conveyed by Leitch to the liquidation of the Chloe Hyde estate. Instead of so doing, he entered into two certain contracts with Paulina W. Kellogg (wife of John, the executor), first transferring to her a third of one-fourth of certain interests in such real property, and next agreeing that she should receive eleven twenty-fourths of the net proceeds.

of the real estate so transferred. It was further agreed between Cole, as administrator, and Paulina Kellogg, that in their final adjustment any balance remaining due to the Chloe Hyde estate from the Daniel Kellogg estate should be deducted from Paulina's share in the net proceeds under such contract.

The daughter Mary Ann Converse having died, her administrator, in July, 1848, brought an action against the executors of Daniel Kellogg's will for an accounting of the trust created for her benefit by that will. In that action it was made to appear that all the executors of the Daniel Kellogg estate were insolvent, and one Elias W. Leavenworth was appointed receiver of the Kellogg estate, and the entire remaining estate transferred to him. Some adjustment of this situation was reached, for on July 1, 1851, the plaintiff having released all claim against the estate of Daniel Kellogg, the receiver was discharged and the estate reconveyed to the executors, except as to a judgment against the executor, Leitch, as to which judgment the receivership was continued.

December 4, 1861, the daughter Catherine Leitch having died, her estate brought an action against John and Paulina Kellogg in connection with the trust created for this daughter's benefit under the Daniel Kellogg will, seeking to have adjudged as fraudulent and void a transfer of certain bank stock from John to Paulina, his wife. Such bank stock it was alleged was a portion of the trust estate created for the benefit of the plaintiff. In that action it appeared that on June 2, 1858, John had assigned to Paulina this bank stock. It was made to appear that, except for a payment of $7,000 by way of the conveyance of real estate, and the further payment of $1,750, both on account of income of the trust estate, John, the executor, had converted the balance of the income of this trust fund. This action resulted in judgment in favor of the plaintiff, which decreed the transfer of these stocks as fraudulent and void.

In March, 1856, the Theological Seminary of Auburn brought action against the Daniel Kellogg estate and the Chloe Hyde estate for accounting under the trust created by the will of David Hyde. The action resulted in a judgment for some $14,611.74 against both estates. That judgment was paid, one-half by each estate, and the judgment was assigned to Paulina Kellogg. In March, 1852, Almeron Cole, as administrator of the Chloe Hyde estate, for the consideration of $5,333.33, transferred to Paulina Kellogg one-third of what he had received by virtue of the conveyance from Christiana Beach. About 1868, partition was brought among the heirs of Chloe Hyde on the lands in Auburn, which had been conveyed by Leitch. Out of the proceeds received by Cole in that action, and as a result of it, Paulina Kellogg was paid by Cole some $9,250.39. In 1859, following foreclosure of mortgages covering portions of the Syracuse lands, which lands were bid in by Dan H. Cole, as a substituted administrator of the Chloe Hyde estate, for $14,254, by arrangement between Dan H. Cole and Paulina Kellogg, Paulina was paid and received $4,583.33.

In November, 1869, a formal written agreement was entered into between Paulina Kellogg, by John, her husband, as her attorney,

upon the one part, and Dan H. Cole, individually and as administrator of the Almeron Cole estate, upon the other, reciting the various contracts between Almeron Cole and Paulina Kellogg, and acknowledging receipt by Paulina of $9,250.39, out of the mortgages upon the properties conveyed by Leitch, which had been enforced, and adjusting Paulina's share in the other mortgages at $4,583.33. This contract adjusted all of the claims under such various contracts, with the exception of the Bradley lot. Later, and in July, 1876, Paulina received from other sources the further sum of $1,604.13. Some time subsequent to March 1, 1852, the executors of the Daniel Kellogg estate conveyed to Almeron Cole, as administrator of the Chloe Hyde estate, three parcels of land, at a stated consideration of $12,000, to apply on the Chloe Hyde estate claim. In that connection, Paulina Kellogg agreed with Cole to thereafter repurchase same from Cole, if she was so requested, at the same price, plus interest. In July, 1860, Paulina Kellogg and John Kellogg, upon the one part, and Dan H. Cole, as administrator of Almeron Cole, and as administrator of Chloe Hyde, entered into a formal written contract, adjusting and finally settling and acknowledging satisfaction in full of the Chloe Hyde claim against the Daniel Kellogg estate.

Another phase of the litigation upon which recovery has been allowed grows out of the Horace White mortgages and involves the following facts: Horace White was the owner of two prior mortgages upon a portion of the Syracuse land conveyed by Leitch to Chloe Hyde. He began foreclosure upon both such mortgages. Judgment on the first mortgage was rendered in June, 1850, and upon the second mortgage in March, 1851. The premises were sold on the second judgment, and were bought in by Leavenworth, the receiver, who conveyed 25 feet therefrom to one Raynor, and White released that strip from his first foreclosure judgment. The balance of these lands were conveyed back to Daniel Kellogg, executor, by Leavenworth, upon the termination of the receivership, still subject to White's first foreclosure judgment. Horace White never enforced that judgment, and he died in 1859. White's executor in October, 1869, assigned the first mortgage, which afforded the basis for the first foreclosure judgment, to Paulina Kellogg by written assignment without recourse. That assignment was never recorded. In November, 1869, the sheriff sold these remaining lands on the first White foreclosure judgment, and Paulina bought them in for $5,436, receipting to the sheriff on account of such sale for that sum.

In the interim following the conveyance from Leavenworth, the receiver, to the Daniel Kellogg executors, these lands were in the possession of the Daniel Kellogg executors; that is, of John Kellogg, the active executor. Their management was intrusted to one Merriam. Following the sale to Paulina, by the sheriff, there was no actual change of possession, and in fact none until some time later, when Paulina conveyed to various parties. Paulina Kellogg received from this property so purchased, through various sales thereof, a large amount of money. Some $9,500 of this money, together with $5,500 of money borrowed by Paulina, was taken by John and invested in

bank drafts and used in the purchase of timber lands in Wisconsin, title to which was taken in the name of Paulina Kellogg, in October, 1882. Eventually she sold these lands for $100,000, an advance of $85,000, a large portion of which profit the referee finds is now in the hands of the defendant. The referee has also found that other lands out of the Leavenworth conveyance were conveyed by Dan H. Cole, as administrator of both the Almeron Cole and the Chloe Hyde estates, to Paulina Kellogg in 1873, and were resold by her at a profit, and that bonds and mortgages which were assigned by John Kellogg, as executor, to Almeron Cole, aggregating over $3,000, were soon thereafter assigned by Cole to Paulina Kellogg.

Another phase of the litigation, in which claimed support lies for a portion of the recovery, arises out of the following facts: In January, 1853, one White and one Davis were the owners of a farm tract in Syracuse, which they then conveyed to Paulina Kellogg for the consideration of $2,000. Paulina conveyed these premises to Merriam, who cut them up into lots and sold them. Merriam and Paulina were to share equally in the profits of these lands. Paulina received from this source, as her share of such profits, over $9,000. This farm, was subject to a judgment lien in favor of the Daniel Kellogg estate, which lien was not asserted, but was allowed to outlaw.

It appears that, upon each of the successive appointments of a representative of the Daniel Kellogg estate, each new representative engaged an attorney to investigate the status of the estate and the details thereof, and that each such attorney did so investigate. It is found that Paulina Kellogg received from her father's estate only about $7,000; that John Kellogg was engaged in no business after 1850, except that for about a year or two, about the year 1860, he was a broker in New York City; that he left New York about 1864, bankrupt. It also appears that Paulina W. Kellogg left a personal estate of over $70,000.

As a conclusion of fact to be drawn from the various records and documents in evidence, the referee has determined that John Kellogg was familiar with and knew of all the dealings between Cole and Paulina Kellogg. Upon such facts (greatly amplified in detail), the referee has found a continuing trust to have existed in John Kellogg, as representing the Daniel Kellogg estate; that Paulina Kellogg, his wife, with his knowledge and active co-operation, took unto herself, by the means above indicated, large portions of the estate of Daniel Kellogg, without consideration, or for grossly inadequate consideration. From such situation he reasons that a continuing trust arose in Paulina W. Kellogg, who held such properties, and the avails and profits thereof, as a trustee for the benefit of the Daniel Kellogg estate.

The referee has further concluded that no knowledge of such fraud, actual or constructive, is to be charged against any of the representatives of the Daniel Kellogg estate, following the death of John Kellogg, until within less than six years prior to the commencement of this action, and that hence no statute of limitations has run as against this action. The referee has awarded judgment upon three classes of matters, as follows:

First. For the profits and interest thereon, accruing to Paulina through her dealing with Almeron Cole, in connection with sums paid by him to her under the various contracts between them, and finding their inception in moneys or property of the Daniel Kellogg estate.

Second. For such proportion of the profits of the Wisconsin timber lands as $9,500 bears to $15,000; it being held that the $9,500 which went into that purchase in equity belonged to the Daniel Kellogg estate, having been realized through the sale by Paulina of the title she purchased under the first White foreclosure judgment, under the circumstances above indicated.

Third. For the profits and interest arising out of the sale of the farm tract conveyed to Paulina by White and Davis, and resold by her to Merriam, and upon which a judgment lien in favor of the Daniel Kellogg estate was permitted to lapse and outlaw.

While we have concluded that the findings of fraud made by the referee are not sufficiently supported by the evidence, and have reversed such findings, yet, if we be wrong in that conclusion, still this judgment must be reversed. The defendant has asserted the statute of limitations as a defense to this action. In opposition to its application it is argued that the relation of John Kellogg to the Daniel Kellogg estate was one of such trust and confidence that a continuing trust arose as to him, in favor of those entitled to the estate, of such a character that no lapse of time would preclude a compulsory accounting against him, until he had openly disavowed that trust and repudiated his responsibility thereunder. The argument is then carried further, that by reason of the close relationship between John and his wife, Paulina, and the manner in which these various properties were transferred from the Daniel Kellogg estate to Paulina, that Paulina merely assumed the same position which John had held with reference to the Daniel Kellogg estate, and took and retained those properties, not as an individual, but in trust and as a continuation of the trust in John, subject to the same disabilities and obligations as was he. It is then urged that no statute of limitations would start running in favor of Paulina until she, in turn, had openly disavowed her obligation in such trust.

[1] That an executor occupies a trust relation toward those entitled to the estate, irrespective of the provisions of the will, and that no statute of limitations commences to run in favor of such executor, until disavowed of the trust by him, seems settled. In re Meyer, 98 App. Div. 7, 90 N. Y. Supp. 185.

[2] There is no doubt but that, assuming the fraud to be established, Paulina may be charged as a trustee by reason of her wrongdoing, and under such circumstances she would be what is ordinarily described as a constructive trustee. Lightfoot v. Davis, 198 N. Y. 261, 91 N. E. 582, 29 L. R. A. (N. S.) 119, 139 Am. St. Rep. 817, 19 Ann. Cas. 747. There seems little doubt of the application of the six-year statute to those cases where a trust arises by reason of the wrongdoing of the person against whom it is asserted. Code of Civil Procedure, § 382, subd. 5; Lightfoot v. Davis, supra. And such statute seems to have application whether the trust is sought to be

enforced at law, in equity, or in Surrogate's Court. In re Rogers, 153 N. Y. at page 322, 47 N. E. 589.

In avoidance of the six-year statute of limitations, the referee has found that the fraud which forms the entire support for the action was not discovered by the plaintiff or his predecessors, until within six years immediately preceding the bringing of this action. Such finding of nondiscovery has no basis in direct evidence. It is an inference sought to be drawn from the entire circumstances of the case.

[3] Of course neither the plaintiff nor his predecessors in 'this trust owed an active duty to discover this fraud. Baker v. Lever, 67 N. Y. 304, 23 Am. Rep. 117; Spallholz v. Sheldon, 148 App. Div. 573, 132 N. Y. Supp. 560.

[4] But with knowledge of the facts from which the inference is to be drawn, such knowledge is sufficient to start the operation of the statute, and it is no answer to say that the inference was not suggested or in fact drawn. As was said in Higgins v. Crouse, 147 N. Y., at page 415, 42 N. E. 6:

"Fraud lies in the intent to deceive, but the mental emotion is inferred from the facts which indicate it, and it is with those facts and the inferences to which they lead that the law necessarily deals. When, therefore, facts are known from which the inference of fraud follows, there is a discovery of the facts constituting the fraud and within the precise terms of the statute. That the defrauded party did not actually draw the inference, but shut his eyes to it, does not stop the running of the statute. He ought to have known, and so is presumed to have known, the fraud perpetrated. But a case may arise where he knows none of the facts, where no circumstance has occurred calculated to arouse his suspicion or disturb his confidence or suggest the need of inquiry."

[5] It seems incredible that there was no discovery of the facts now claimed to indicate fraud throughout the many years that have elapsed since the transactions now complained of.

The various transfers of real property were, of course, matters of common knowledge and largely the subject of public record. The various litigations, brought to light, were also matters of public record, and their probative force today is no greater than years ago.

The transactions complained of begin in the early 50's and were included within the next 30 years. John Kellogg died in 1883, and throughout the many years since that time many, if not all, the salient facts in this case must have been known. No effort to assert them seems to have been made, either during the many years that John was living after the acts complained of, nor during the long period which his wife, Paulina, survived him. Under such circumstances, we do not deem the conclusion of the referee as to nondiscovery of the fraud to be well founded, resting, as it does, entirely on circumstantial evidence.

Since the death of John, three representatives of the Daniel Kellogg estate have been appointed, and hence three separate investigations of the estate have been made, and the more reasonable inference from the entire situation seems to be that the facts now urged to support the findings of fraud were discovered in the main by each of the three representatives.

Under such circumstances, the six-year statute of limitations is clearly applicable, if the trust claimed to exist in Paulina was in fact a constructive trust, arising from her wrongdoing.

[6] But if the argument of the respondent is to prevail, and the trust asserted to exist in Paulina be more than a constructive trust, and be regarded as a continuation of the trust in John, and if it can be said that no statute of limitations could become applicable in favor of Paulina until an open disavowal of the trust by her, and if it could be further said that there has been no such open disavowal, and that her ownership of these various properties throughout all these years was not such a disavowal as to start the running of the statute, still the plaintiff must be denied relief on account of the staleness of the claim now asserted.

This action is in equity, where the parties have come to have equity done them. The powers of a court in equity, in furtherance of an equitable result, are and should be generously exerted. However, it should be certain that the result sought is equitable. When the parties have slept upon their rights for so long a time as to render uncertain the equity of the result sought, and by reason of the death of witnesses and parties it is extremely difficult to determine the actual facts, equity should deny relief. This, lest in the exercise of its great powers it reach a wrong result, because of the uncertainty of the facts with which it attempts to deal.

Such a situation seems to be presented by this case. The Daniel Kellogg estate, large in amount and complicated in its entirety, arose in 1836 upon the death of the testator. Interwoven with it, in such a manner as to afford many of the claimed grounds for relief, was the estate of David Hyde, which came into being in 1824. With a constant means at hand of compelling an adjustment of this Daniel Kellogg estate, and with attention directly and publicly drawn by litigations and public records to improvident management of the estate and to the insolvency of its executors, no effort seems to have been made to liquidate the estate and determine it, throughout the many years that have elapsed since accurate proof of the facts was available. Witnesses are now dead, as well as parties, so that we are now practically without proof, except such as may be gleaned from ancient records, documents, etc. Under such circumstances, the court is asked to determine large property interests, the ownership of which rests upon facts now almost incapable of proof. Inferences which may now be drawn from cold and scant records of years ago are likely to be far different than inferences to be drawn from the same records, supplemented by other important, but unrecorded, facts, and no court is in a situation now well to judge the real purposes of John and Paulina Kellogg which pervaded the transactions under inquiry. As was said in Calhoun v. Millard, 121 N. Y., at page 81, 24 N. E. 29, 8 L. R. A. 248:

"It is and always had been the practice of courts of equity to remain inactive where a party seeking their interference has been guilty of unreasonable laches in making his application. Story's Eq. Jur. § 1520. The principle is stated with great force and clearness by Lord Camden in Smith v. Clay, 2 Ambl. 645: 'Nothing can call forth this court into activity but conscience,

good faith, and reasonable diligence. Where these are wanting, the court is passive and does nothing. Laches and neglect are discountenanced and, therefore, from the beginning of this court, there was always a limitation to suits in this court.'"

In McKechnie v. McKechnie, 3 App. Div. 91, 39 N. Y. Supp. 402, the Appellate Division in this department applied the rule of laches to an action brought to redeem a mortgage, where it appeared that the transaction occurred some 33 years before the trial, and that nearly all the actors in the transaction at the time the cause of action arose had died. This court likewise followed the same rule in McCartney v. Titsworth, 119 App. Div. 547, 104 N. Y. Supp. 45, there saying:

"It may further be suggested that the claim of equitable title is a stale one, which a court of equity would hardly aid the defendant to establish. The deed to the wife was given and title has been held by her 38 years before her death, and it was more than 4 years after her death that the claim was first made by the defendant in this action. See McKechnie v. McKechnie, 3 App. Div. 91 [39 N. Y. Supp. 402]; Town of Mt. Morris v. King, 8 App. Div. 495, 499, 500 [40 N. Y. Supp. 709]; affirmed sub nom. Town of Mt. Morris v. Thomas, 158 N. Y. 450, 456, 457 [53 N. E. 214]; Hutchinson v. Hutchinson, 84 Hun, 482, 487 [32 N. Y. Supp. 390]."

In Matter of Accounting of Neilley, 95 N. Y. 382, the court took occasion to say:

"But, assuming that the case was one solely of equitable cognizance, and that, for any reason, the statute afforded no protection, it is the law of courts of equity, independent of positive legislative limitations, that they will not entertain stale demands."

The same rule was early recognized by the Court of Chancery in this state in Ellison v. Moffat, 1 Johns. Ch. 46.

[7] It is suggested that the defense of laches is not available, inasmuch as it was not specifically pleaded. This is not controlling. In equity it is the general rule:

"That the relief to be administered will be adapted to the exigencies of the case as they exist at the close of the trial." Lightfoot v. Davis, supra.

It is also true that the defendant, throughout the trial, did assert the staleness of the claims of plaintiff, although basing his claim more particularly upon the statute of limitations than upon the general doctrine of laches. The laches necessarily appears upon the proof of plaintiff's case and may be availed of by the court in the final relief to be decreed.

It thus appears that if, by reason of fraud, a constructive trust arose in Paulina Kellogg, this action is barred by the six-year statute of limitations. On the other hand, if the trust was a continued trust, and a mere extension of that in John, so that no statute of limitations has run, then relief should be denied plaintiff by reason of the staleness of the claim and the uncertainty of the facts upon which relief must be predicated.

Under such circumstances, not only must the order and judgment appealed from be reversed, but the complaint should be dismissed.

Judgment reversed upon questions of law and fact, and complaint dismissed, with costs, including costs of this appeal. Order granting

additional allowance reversed. Order to be settled before Mr. Justice LAMBERT on five days' notice, at which time shall be submitted proposed additional findings to be made by this court and a memorandum of the findings of the trial court to be disapproved. All concur.