WILLIAM J. SMITH, as Special Administrator of JOHN PENN CURRY, Deceased, Appellant, *v.* THE STATEN ISLAND LAND COMPANY and Others, Defendants, Impleaded with DAVID CREAR and Others, Respondents.

First Department, December 29, 1916.

Equity — suit to recover securities on theory of a trust or to recover their value — conversion — sale by pledgee without notice to pledgor — Statute of Limitations — suit to redeem securities alleged to have been pledged.

Suit to have it declared that certain certificates of stock and certain bonds were owned by the plaintiff's intestate, and to impress them with a trust "in the hands of whichever defendants they may be," and for an accounting to determine the amount of any advances which may be a lien upon or charge against them, and for judgment against any defendant in whose hands they may be found for the value thereof should possession be awarded to plaintiff and delivery not be made.

*Held*, on all the evidence, that a judgment dismissing the complaint on the merits should be affirmed.

A sale of securities by bailees or pledgees thereof without notice to the bailor or pledgor constitutes a conversion. The Statute of Limitations commences to run against such action regardless of whether or not the pledgor had notice.

A suit in equity will not ordinarily lie for the redemption of securities pledged. To give the court jurisdiction special facts and circumstances must be established showing the necessity for an accounting to determine the amount necessary to be paid for the redemption or the amount which the pledgee or person in whose possession the property is has received thereon for dividends or otherwise, for which he is accountable to the owner.

APPEAL by the plaintiff, William J. Smith, as administrator, from so much of a judgment of the Supreme Court in favor of the respondents, entered in the office of the clerk of the county of New York on the 13th day of March, 1916, as dismisses the third amended complaint on the merits as against respondents upon the decision of the court after a trial at the New York Special Term.

*Arthur A. Michell,* for the appellant.

*Clarence L. Barber,* for the respondents.

LAUGHLIN, J.:

The only interest of the respondent Parson is as a stockholder of the respondent company, the Queen Anne Land Grant Company. The appeal is not urged as against him. It is stated in the points that it may be disregarded.

This action was commenced by John Penn Curry as plaintiff by service on the respondent Crear on the 13th day of September, 1906. Curry died March 8, 1908, and the plaintiff was appointed special administrator "to prosecute only and not with power to collect or compromise." The action has been prosecuted by the special administrator as if he had been duly substituted although substitution is not shown; and while attention is drawn to the point no objection on that ground was presented on the trial or is urged here.

The action is brought to have it declared that certain certificates of stock and certain bonds were owned by the plaintiff's intestate, and to impress them with a trust "in the hands of whichever defendants they may be," and for an accounting to determine the amount of any advances which may be a lien upon or charge against them; and for judgment against any defendant in whose hands they may be found for the value thereof should possession be awarded to plaintiff and delivery

not be made. The complaint also contains the usual prayer for "other, further or different relief."

All of said certificates of stock and bonds were delivered by one C. J. Bushnell, who had had possession of them and had kept them in his father's safe, to one Metcalfe or to the firm of Brayton Ives & Co., stockbrokers, of which he was a member, on the 7th of November, 1885. Metcalfe died February 1, 1896, and his partner, Brayton Ives, found the stock and bonds in the office after his death, and thereupon took possession of them, and sold them to the defendant Lindley, as to whom the complaint was dismissed at the opening, on counsel for plaintiff stating that no personal claim was made against him, in 1904 for $10,000. Lindley sold them to the respondent Crear for $17,500 on October 14, 1905; but presumably owing to the fact that the consideration was not fully paid they were not delivered until January 10, 1906, at which time, however, the purchase price had not been fully paid. The stock and bonds to which the action relates consist of (1) three certificates of stock in the Richmond County Land Company, Limited, Nos. 508, dated May 13, 1885, for 6,666 shares issued in the name of H. W. Nichols; 509, bearing the same date, for 3,034 shares, and 510, dated June 1, 1885, for 1,800 shares, both issued to Bertram Cruger, all indorsed in blank on the date of issue; and thirty-two bonds of said company being part of a series of bonds of the par value of $1,000 each, aggregating $75,000, secured by a mortgage on all of the company's right, title and interest in and to certain lands on Staten Island, Richmond county, "granted and conveyed to Lancaster Symes by Anne, Queen of England, by her Royal Letters Patent," dated October 27, 1708, duly recorded in the office of the Secretary of State; (2) certificate No. 2 of the Staten Island Dry Dock, Storage and Improvement Company, dated May 20, 1885, issued to said land company for 9,995 shares, with the power of attorney signed in blank, the date not shown; (3) six certificates of stock of the Staten Island Land Company, issued November 7, 1885, numbered 1, 2, 3, 5, 6 and 7; No. 1 being for 1 share issued to "James B. Metcalfe," not indorsed; No. 2, for 1 share issued to C. S. Bushnell with power of attorney, indorsed to Walter J. Roberts; No. 3, for

1 share, and No. 5 for 1,000 shares, issued to C. J. Bushnell, indorsed in blank; No. 6 for 999 shares, issued to H. W. Nichols, indorsed in blank; No. 7 for 998 shares issued to Bertram Cruger, indorsed in blank; all excepting No. 1 having been indorsed on the date of issuance.

The respondent company, of which respondent Crear is the president, was organized on the 23d of January, 1906, and on or about the 31st day of January, 1906, Crear delivered the stock and bonds to it in exchange for part of its capital stock.

The issues were first brought to trial in 1911, but there was a mistrial at that time. The *respondent company* was not joined as a party defendant until the 28th of March, 1912. On the second trial the complaint was dismissed, on the 29th of February, 1916, on the theory, as shown by the decision, that both Lindley and Crear were *bona fide* purchasers for value, and transferred good title to the respondent company, which had the stock and bonds; and that the action was barred by the Statute of Limitations and by common-law prescription.

Prior to the 19th of March, 1879, Curry and one Johnson were the owners, apparently in equal shares, of said land grant given by Queen Anne, which covered lands above and below high water. On that day the said Richmond Company was organized with a capital stock of 40,000 shares of the par value of fifty dollars each, for the purpose of exploiting the lands covered by said patent; and said C. S. Bushnell, who died in 1896, was its president and one of the promoters.

Curry and Johnson conveyed the lands covered by said patent to said company, at the time or shortly after its incorporation, in consideration for all of its capital stock, with the exception of twenty-five shares issued to the incorporators, and said entire issue of its bonds so secured, which stock and bonds were divided equally between Curry and Johnson. Each of them retained 3,000 shares and redelivered the balance of the stock issued to them to the company. The reason for this action only appears by hearsay evidence, which, however, remains in the record without objection or exception, to the effect that it was " for the benefit of the company, to exploit the company." Ten thousand of the 11,500 shares of stock of

said last-named company in question here are stock issued in place of part of the stock so delivered back to the company. One Gould was the first secretary of the Richmond Company, and he absconded in 1882, taking with him the original stock book of the company. C. J. Bushnell, the son of C. S. Bushnell, was elected secretary to succeed Gould. Some or all of this returned stock was reissued to Gould, and he pledged it as security for his notes, on which C. S. Bushnell was indorser, and after Gould disappeared Bushnell was obliged to pay the notes, and in that way obtained possession of some of the reissued stock. According to the testimony of C. J. Bushnell, Curry bought out the interest of Johnson in the stock and bonds of the company for $7,000 in 1885. Fifteen hundred of the 3,000 shares originally issued to Johnson and purchased from him by Curry, and 10,000 of the shares which had been so issued to Gould were reissued ultimately in said three certificates, No. 508, No. 509 and No. 510, which are in question here; and Nichols and Cruger, to whom they were respectively issued, were at that time clerks in the employ of Brayton Ives & Co., but they never had possession, and evidently had no personal interest in the stock, for the certificates therefor were, as soon as issued, delivered to C. J. Bushnell, and remained in his possession until he delivered them to Metcalfe or to Brayton Ives & Co., as already stated. It appears to have been so issued in the names of Cruger and Nichols by direction of C. S. Bushnell. Nichols died before the trial but Cruger was then living. He was not called as a witness but that is accounted for by the fact that appellant claims that he and Nichols were dummies in the transaction. The record does not show the whereabouts of the remaining bonds, or of the remaining stock of the Richmond Company, with the exception of 4,000 shares standing in the name of one Beaman, 1,000 shares standing in the name of one Hazleton, and 5 shares standing in the name of C. J. Bushnell.

In 1883, when the title to the Symes Patent, so called, was in said Richmond Company, negotiations were opened with the Baltimore and Ohio Railroad Company at the instance of Curry and C. S. Bushnell, with a view to selling the property. With respect to this Bushnell testified, in substance, and there is no evi-

dence to the contrary, that early in the year 1883, long prior to the deposit of the stocks and bonds with Metcalfe, there was a verbal agreement between his father, Metcalfe and Curry, to the effect that two companies were to be formed as required by the Baltimore and Ohio Railroad Company, one to take the title to the upland and the other to the water-front lands of the Symes Patent; and that the firm of Brayton Ives & Co. was to be used to finance the enterprise and " as the clearing house for the entire transaction; " and that Metcalfe, Curry and his father were each to receive one-third of the profits. Evidently pursuant to this arrangement two companies were incorporated as hereinafter stated.

The Staten Island Dry Dock, Storage and Improvement Company was organized on April 21, 1885, and C. J. Bushnell was elected its secretary and treasurer. The dry dock company, by resolution of its board of directors on April 21, 1885, accepted a proposition made by Brayton Ives " *to obtain from* " *the Richmond Company* and its successors and assigns a conveyance to the dry dock company of *certain* lands in Staten Island in consideration of the issuance to him of 2,000 shares of the capital stock of the dry dock company. On May 20, 1885, the Richmond Company conveyed to the dry dock company the water front. At a meeting of the board of directors of the Richmond Company on November 25, 1885, a resolution was adopted authorizing the execution of a deed of all the property and effects of the company to Brayton Ives for $100; and on November 25, 1886, the Richmond Company conveyed to Ives all its right, title and interest in the lands covered by the Symes Patent, which evidently only embraced the upland. It was conceded that this conveyance was procured by Ives to enable him to make the conveyance to the dry dock company pursuant to his proposition which it had accepted. Ives, however, did not convey to the dry dock company, and did not receive the 2,000 shares. All of the 20,000 shares of the dry dock stock was issued to the Richmond Company in three certificates; No. 1, for 10,000 shares; No. 2, for 9,995 shares, which is one of the certificates in question; and No. 3, for 5 shares. The trial court found, at the request of the plaintiff,

that the consideration for the conveyance of the water front by the Richmond Company to the dry dock company was the entire capital stock of the dry dock company, less five shares. The court also found at the request of plaintiff that 10,000 shares of the stock of the dry dock company was returned to it by the Richmond Company, and that 9,995 shares, being the balance of the stock less the five shares issued to incorporators, were transferred by the said Richmond Company by indorsement in blank, "together with the balance of the premises affected by the Symes Grant *to Brayton Ives,* for an expressed consideration of $150." There is no express evidence to sustain the finding that certificate No. 1 for 10,000 shares issued by the dry dock company to the Richmond Company was redelivered; but it is to be inferred that the certificates and records of both companies remained in the custody of C. J. Bushnell, who was secretary of both companies; and he testified that in 1909 he delivered this certificate to one Wilson, who was negotiating for the purchase of the Symes Patent; and that he took Wilson's receipt therefor, and that the stock had not been returned.

On November 5, 1885, said Staten Island Land Company, of which Metcalfe was president and C. J. Bushnell secretary, was incorporated. That company, by resolution on November 7, 1885, offered to "purchase from Mr. Brayton Ives the stock and bonds" of the Richmond Company held by him; and to issue in payment therefor its entire capital stock, "or such part thereof as may be necessary to complete such purchase." On July 1, 1886, Brayton Ives and wife conveyed to the Staten Island Company by deed, all their right, title and interest in the lands covered by the Symes Patent, the deed reciting that said lands were purchased by Ives from the Richmond Company by deed dated January 7, 1886; but no conveyance of that date was proved, and the only conveyance from the Richmond Company to him shown by the evidence was the one under date of November 25, 1886. The capital stock of the Staten Island Company was 3,000 shares; and of this by direction of C. S. Bushnell and Metcalfe one share each was issued to Metcalfe and the Bushnells, and they are certificates Nos. 1, 2 and 3 of the Staten Island Company in question here, and 2,997 shares to Ives in one certificate. Bushnell

testified that this certificate to Ives for 2,997 shares was surrendered and canceled, and there were issued therefor the certificates Nos. 5, 6 and 7 of the Staten Island Company which are the other certificates of that company which are here involved. The six certificates, however, bear the same date as the day on which the resolution of the Staten Island Company was adopted; and according to the testimony of Bushnell to the effect that he delivered them to Metcalfe or to Brayton Ives & Co. on November 7, 1885, it would seem that they had been issued in advance.

Neither the original nor the first or second amended complaint is in the record; but extracts read into the record from the original complaint verified by Curry, to disprove the plaintiff's claim made upon the trial, show that Curry then claimed that the stocks and bonds were "deposited" with the firm of Brayton Ives & Co. "in trust for plaintiff and his then associate, one Samuel E. Johnson, and as and for security for advances of money;" that Ives claimed to have made certain advances of money on the security "of certain stocks and bonds" but that plaintiff was ignorant of the amount, but alleged it to be about $7,000; and that it was understood and agreed between Curry and the members of said firm at the time of "the deposit with them of said stocks and bonds; that in the event that no money was advanced or paid by them, or either of them, upon the security of said stocks and bonds for the purposes and upon the agreement hereinbefore alleged and set forth, that plaintiff [Curry] should have the absolute right and privilege, at any time, to demand and receive back from said Ives and Metcalfe, all of said stock and bonds." In the third amended complaint, served after the mistrial, the plaintiff alleges that Curry bought Johnson's interest in the Symes Patent for $7,000, which amount was advanced by Metcalfe, who delivered it to C. S. Bushnell who loaned it to Curry and Curry paid it to Johnson, and that it was agreed between Metcalfe, Curry and Bushnell that Metcalfe would thereafter advance the money necessary to finance the contemplated sale of the land to the Baltimore and Ohio Railroad Company; that the stocks and bonds and other stock of the same companies were deposited with said *Metcalfe* pursuant to an agreement between

him and Curry and C. S. Bushnell "to hold them as trustee, and that said Bushnell and Metcalfe would use their best endeavors to secure a purchaser or customer for the said securities, and the said Metcalfe would finance such promotion and sale by future advances of money, and that for such services and such advances upon the consummation of such a sale that the said Metcalfe and said Bushnell should each receive one-third of the proceeds thereof, and that said Curry should receive the balance, after the payment of such sums advanced including the $7,000 advanced to purchase the interest of said Johnson." It is further alleged in the present complaint that none of the stocks or bonds were sold during the lifetime of Metcalfe and that no other moneys were advanced by him " for the purpose of procuring or consummating any such sale;" that Metcalfe never demanded payment of the moneys advanced by him on the securities or repudiated the trust, and Curry never tendered payment of such advances; that Metcalfe placed the securities in the safe of his firm, where they remained until after his death, and that thereafter defendant Ives — who was not served and who died October 22, 1914, after having testified on the first trial — as surviving partner had the physical possession of the stocks and bonds " as custodian merely " to hold them until a demand therefor by the personal representatives of Metcalfe, and that Ives had not title to the securities, and possession thereof was not delivered to him by Curry " for any purpose whatever;" that Ives, in making the sale to Lindley, claimed that the stocks and bonds had been delivered to his *firm*, but that if that were so, Ives as surviving partner made no demand on Curry for the amount advanced on the securities before making the sale to Lindley. But according to the testimony of Bushnell, which is the only evidence on the subject, the contemplated sale to the Baltimore and Ohio Railroad Company had fallen through before the stocks and bonds were deposited with Metcalfe on November 7, 1885. He testified that after the deal with the railroad company had fallen through he and his father went to Metcalfe and one of them suggested that all of the stocks and bonds be placed in the custody of Metcalfe " in trust so as not to have them get scattered," and so that in case they found a new customer " we will have every-

thing in hand to make delivery," and that Metcalfe assented by saying that was a good idea and to " bring them in and I will take care of this whole thing." After so testifying the witness further testified that the reason the stocks and bonds were delivered to Metcalfe was so that they would be kept in the safe of Brayton Ives & Co., which was claimed safer than where he had them; and that this course was suggested either by his father himself or Metcalfe and assented to by Metcalfe; and that his father then suggested that he write a letter to Metcalfe stating the interest of the " three parties concerned, * * * Metcalfe, Brayton Ives & Company a third * * * and father a third and Curry a third;" that his father then and there wrote Exhibit 2 and delivered it to Metcalfe, who thereupon, at the suggestion of his father, wrote a letter to Curry, which the witness copied into the letter book of Brayton Ives & Co. and mailed to Curry, and which Curry subsequently admitted having received, and that later the same day he delivered the stocks and bonds to Metcalfe. Exhibit 2 was offered in evidence by respondents and received over plaintiff's objections, which are not urged here; for plaintiff set it forth in his bill of particulars as constituting part of the trust agreement and now apparently relies upon it as tending to show a trust. It was addressed to Metcalfe *as president of the Staten Island Company* and is as follows: " Will you write Mr. John Penn Curry a letter stating that you will issue to him one-half the capital stock of the Staten Island Land Company as soon as the trustees so direct. And in the meantime agree with him that the income to said company from the sale of Land or from any other sources shall be divided in thirds; one third to be paid to him, said Curry, one third to be handed me as trustee for my wife and family, and the other third retained as the property of Brayton Ives & Co., it being understood and agreed to that until either one of the present parties in interest part with their holdings in said Staten Island Land Company the net income is to be equally divided as before named, one third to each party." The contents of the letter to Curry were not shown, but it is fairly to be inferred from Metcalfe's assenting to write it that it was of the same purport. The witness subsequently testified that the conversation

with respect to these letters was on November seventeenth, and that they were written that day and not on the day the stocks and bonds were delivered to Metcalfe. It will be observed that Exhibit 2 is silent with respect to the stocks and bonds having been delivered to Metcalfe, and, therefore, in no manner tends to show that they were delivered upon any trust. On the contrary, it assumes that Metcalfe, as president of the Staten Island Company, which had been incorporated only two days before, under the direction of the trustees, had control of its stock, all of which, with the exception of three shares, had been issued to Brayton Ives; and the day Bushnell says it was delivered to Metcalfe Ives' certificate was canceled, and the three certificates issued in place thereof to Bushnell, Cruger and Nichols, by direction of C. S. Bushnell and Metcalfe, as already stated. That left Curry with nothing to show his interest, which, I think, accounts, in part, for the letter to him. The writing of that letter is further accounted for by other evidence, introduced by the respondents, tending to show that if the land was not disposed of Curry was to have one-half the stock of the Staten Island Company, and C. S. Bushnell and Brayton Ives & Co. were each to have one-fourth of the stock. Through this stock ownership that would, in effect, give Curry a one-half interest in the Symes Patent, and each of the others a one-fourth interest; but according to such other evidence Curry's interest was subject to the repayment of the $7,000 advanced by Metcalfe, which doubtless accounts for the fact that no stock was issued to Curry, and that the stock representing his interest subject to the claim or lien for such advances was represented in the stock issued to the employees of Brayton Ives & Co. If, however, according to that evidence, the property was disposed of, and Brayton Ives & Co. made further advances, then Curry and Bushnell and Metcalfe, or Brayton Ives & Co., were each to have one-third of the profits; and if disposed of without further advances, then the profits were to be divided as the stock was to be divided, viz., Curry one-half, and each of the others one-quarter.

Another version of delivery of part of the stocks to Brayton Ives & Co. on said November 7, 1885, was given in an answer

interposed herein in the lifetime of Curry by the Staten Island
Company and verified by C. J. Bushnell, who was its secretary,
and which he, on cross-examination, admitted was true. That
answer showed that the stocks of the Staten Island Company
and the dry dock company in question were owned by said
companies, and were delivered by them to Brayton Ives & Co.
on said November 7, 1885, " in escrow " and " in trust " for the
companies, and were to be redelivered to the companies if the
sale to the railroad company did not go through; and in the
event that the sale was consummated, Brayton Ives & Co. were
to receive one-third of the proceeds for their services and
the expenses of negotiations and of incorporating said two com-
panies, which expenses they had agreed to defray; and Curry
and C. S. Bushnell were each to receive a third of the proceeds
of the sale. It was further alleged in said answer, which
Bushnell testified was true, that after the death of Metcalfe the
stock of the Staten Island Company was retained by Brayton
Ives as surviving partner " in escrow and in trust, as the prop-
erty of this defendant," and that at the time the certificates of
stock were delivered by Lindley to Crear, they were the prop-
erty of the Staten Island Company, " and impressed with the
said trust under which they were originally put in escrow in
the hands of said Brayton Ives & Company as aforesaid." Still
another version of the delivery of part of the stocks to Brayton
Ives & Co. was given in an affidavit made by C. J. Bushnell in
this action, and read in evidence on his cross-examination. In
that affidavit he said that the Staten Island Company stock was
delivered to Brayton Ives & Co. by himself on said November
7, 1885, " in trust and in escrow " substantially as stated in the
answer of that company, as aforesaid; that Metcalfe was presi-
dent of the Staten Island Company and had principal charge
of the financial negotiations on behalf of Brayton Ives &
Co. and the negotiations on behalf of the Staten Island and
dry dock companies, and that Metcalfe stated and represented
to him and to his father that Brayton Ives & Co. had spent con-
siderable money in and about the organization of said com-
panies and the negotiations for the contemplated sale to the
railroad company, " and suggested and requested that the said
shares so deposited as aforesaid with his said firm of Brayton

Ives & Company be allowed to remain in escrow with such firm, pending a possible revival of the said negotiation with said railroad company, or the finding of some other purchaser, through whose purchase said firm might be reimbursed for its outlay already incurred and become entitled to a share of the proceeds of the sale. That deponent and his said father, C. S. Bushnell, directors of said Staten Island Land Company, besides said Metcalfe, who was also the president and a director thereof, assented to such proposition, and that in pursuance thereof said shares were accordingly left in escrow subject to the terms upon which, as aforesaid, they were originally deposited in said firm. That said shares so continued in escrow and in trust in the hands of said Brayton Ives & Company until the death of said Metcalfe, which occurred on or about the first day of February, 1896."

The trial court found that there was no trust with respect to said stocks and bonds, and that neither Metcalfe nor Ives nor their firm nor any one else became a trustee; and also held that the $7,000 was advanced by the firm of Brayton Ives & Co., and that the stocks and bonds were delivered to and held by the firm either as absolute owners or under a power of sale coupled with an interest for said $7,000 advanced for the benefit of the owners; and that they were so sold to Lindley by Ives as surviving partner, "or by virtue of rights thereto acquired by him;" and that the amount received from Lindley was less than the amount due on account of the advance of the $7,000; and found as conclusions of law that said firm was vested "with plenary power of sale of said stocks and bonds either as owners or under a power duly delegated;" and that the agreement alleged with respect to a trust as amplified by the bill of particulars does not constitute a trust in Curry's favor; and that the power of sale alleged was coupled with an interest of $7,000 which survived Metcalfe's death; and that Curry was not entitled to the possession of the stocks and bonds without a tender of the amount due thereon.

The appellant claims that these findings and conclusions are not supported by the evidence. The substance of all the material evidence bearing thereon has been stated with the exception that the evidence does not conclusively show that the

$7,000 was advanced by Metcalfe as alleged in the complaint. The evidence on that subject is the testimony of Bushnell to the effect that he received the $7,000 in bills from his father and delivered them to Curry; and that he thought and believed that his father received them from Metcalfe, and that his father had a bank account, and he looked for checks, but found none to show that the money was drawn from his father's bank account.

Prior to the time of the trial now under review C. S. Bushnell, Metcalfe, Curry and Ives and Nichols had died, and the only one alive who had taken an active part in the transactions was Bushnell's son, who plainly favored the plaintiff. It was manifestly very difficult, if not impossible, to ascertain the true facts with respect to these complicated transactions the material part of which occurred upwards of thirty years ago. It is, however, fairly to be inferred from the evidence that Metcalfe advanced the money and held the stocks and bonds, not individually, but for his firm, as found by the trial court. It appears that his partner, Ives, took an active part in the conveyance of the title from the Richmond Company to the other companies, and that the firm, not Metcalfe, was to share in the ownership of the stocks and bonds and in the profits if the property was sold. In further support of this theory it appears that no accounting was made by Ives to the executors of Metcalfe, and that no accounting was demanded with respect to the proceeds of the sale to Lindley. It fairly appears that the firm, and after Metcalfe's death, Ives, dealt with these stocks and bonds as a firm matter and sold them in liquidating the assets of the firm. The firm of Brayton Ives & Co. was dissolved May 2, 1889, Ives retiring from active business and a new limited copartnership under the name of J. B. Metcalfe & Co., with Ives as a special partner, was formed to continue the business. On the 23d of October, 1891, before the sale to Lindley, Ives, in the name of "Brayton Ives & Co., in liquidation," gave an option to one Shaw to purchase these stocks and bonds for $10,000, which is the amount for which they were later sold to Lindley; and that option was subject to "any claim or rights to a portion thereof which may be set up and sustained by either" C. S. Bushnell or

Curry. Curry became aware of this and it appears by an affidavit made by him, evidently to sustain a preliminary injunction herein, that Shaw showed him the option and that he stated to Shaw that neither of the companies, whose stocks and bonds are in question, had good title to the lands, and that he refused to consent to or to join in the sale. That affidavit shows that Curry did not then claim that the firm did not own or have the right to sell the securities or that they were offered for less than their value. Ives was living at the time of the mistrial and was called as a witness; but evidently he had no personal knowledge with respect to the material transactions as then presented, and his testimony only tends indirectly to contradict the testimony of Bushnell.

If the evidence established a trust, then it might become necessary to consider the evidence upon which it is claimed the respondents received the stocks and bonds with notice of the trust. I am of opinion, however, that the evidence fails to show that the stocks and bonds were delivered to Metcalfe, or to his firm, upon any trust. In one view of the evidence, Curry did not own any of the securities, and in another it might be said that they were merely delivered for safekeeping, which would constitute a bailment; but the reasonable inference from the evidence is, I think, that Curry owned a share or interest in the securities, the extent of his share or interest being contingent, and that they were delivered, not for safekeeping, but because the firm of Brayton Ives & Co. had acquired an interest therein to the extent of a one-quarter ownership if the land should not be sold as contemplated, and to insure their one-third interest in the profits in the event of a sale; and that to the extent of Curry's interest or ownership therein, they were to be held by Brayton Ives & Co. as security for the moneys theretofore advanced, which gave them a lien thereon. On that theory Curry retained an interest in the stocks and bonds and Brayton Ives & Co. were under a duty to redeliver his proportionate share on being reimbursed for the moneys advanced if the property was not sold. A cause of action would not accrue to Curry on that contract obligation until a tender of the money as security for which his interest in the stocks and bonds were pledged, and the evidence showing that there was

no such tender would preclude the Statute of Limitations from being successfully interposed as a bar to the action against Brayton Ives & Co. for a breach of the contract. (*Ganley* v. *Troy City National Bank*, 98 N. Y. 487.) When, however, the pledgees sold the securities to Lindley in 1904 without notice to Curry, that constituted a conversion, and it would be a conversion whether they were held by Brayton Ives & Co. as bailees or as pledgees; and thereupon a cause of action arose in favor of Curry for conversion of the stocks and bonds and the Statute of Limitations commenced to run regardless of whether or not he had notice of the conversion. (*Ganley* v. *Troy City National Bank, supra; Allen* v. *Mille*, 17 Wend. 202; *Lightfoot* v. *Davis*, 198 N. Y. 261; *Glover* v. *National Bank of Commerce*, 156 App. Div. 247.) If the action could be regarded as one in conversion, it was timely brought as against the respondent Crear, for he was served within about two years after the sale to Lindley; but it is not an action for conversion as shown by the prayer for relief which has been set forth. It is a suit in equity to recover the securities on the theory of a trust, and in the event that delivery cannot be had, to recover their value from the person in whose hands they are found. It was brought to trial and tried as a suit in equity. The Statute of Limitations having now run against an action for conversion in favor of the plaintiff against Crear, it is not necessary to consider whether any of the findings or conclusions of law would affect the plaintiff's right of action for conversion against him.

The action not having been brought against the respondent company until more than six years after the conversion, and it not having been originally named as a party, the running of the Statute of Limitations was not saved by the service upon the respondent Crear (*Shaw* v. *Cock*, 78 N. Y. 194), and it would be barred as against the company even if it could be regarded as an action for conversion.

If Curry was entitled to have the stocks and bonds returned in the event that no moneys were advanced by Metcalfe or by Brayton Ives & Co. thereon as contemplated, as he alleged in the original complaint and the court found was his claim, then it is quite clear on the finding of the trial court, which is supported by the evidence and is in accordance with the allega-

tions of the present complaint, that no moneys were advanced after the stocks and bonds were so deposited, and the finding that the enterprise was abandoned on or before December 1, 1891, Curry's right to the return of the stocks and bonds accrued in 1891, and a cause of action in his favor against Metcalfe or Brayton Ives & Co. to recover the stock would in any event have been barred by either the six or ten-year Statute of Limitations, depending upon whether the action was in replevin or in equity. (*Brown* v. *Bronson*, 93 App. Div. 312.) The only other possible theory upon which the action might be maintained is if it could be regarded as a suit in equity to redeem the stocks and bonds on the theory that they were pledged; but a suit in equity will not ordinarily lie for the redemption of property pledged, and to give the court jurisdiction special facts and circumstances must appear showing the necessity for an accounting to determine the amount necessary to be paid for its redemption, or the amount which the pledgee or person in whose possession the property is has received thereon for dividends or otherwise for which he is accountable to the owner. (*Treadwell* v. *Clark*, 114 App. Div. 493; affd., 190 N. Y. 51.) The action, however, is not sought to be maintained upon that theory, for counsel for the appellant, both in his main brief and in his brief in reply, contends that the stocks and bonds were not pledged; and not only that no money was advanced by Metcalfe or Brayton Ives & Co. after they were deposited, but that the alleged advance claimed to have been theretofore made was not an advance of money to Curry either on the security of these stocks and bonds, or otherwise, and that it was a loan to Bushnell; and he further claims that the effect of the findings made by the trial court is that Metcalfe or Brayton Ives & Co. paid the money to Johnson for his interest in the stocks and bonds, and that, therefore, upon no theory were they warranted in selling Curry's interest in the stocks and bonds. There was no money received by the respondent company on account of these stocks and bonds by way of dividends or otherwise. It is quite clear, therefore, that the special facts and circumstances showing the necessity for an accounting to justify an action for redemption of the securities on the theory that they were pledged do not exist in the case at bar.

Moreover, the trial court found on conflicting evidence that Lindley, Crear and the respondent company, respectively, purchased the stocks and bonds for value and without notice of any right, title or claim thereto by Curry or by the plaintiff as his representative.   Lindley testified that he purchased the stocks and bonds from Ives for $10,000 which he paid in cash from his own funds, and that at that time he had no notice or knowledge that Curry claimed any interest therein.   There was other testimony tending to show that at that time he had notice that Curry claimed some interest in the stocks and bonds by virtue of some trust.   The evidence presenting that issue of fact was given by witnesses testifying to transactions that had occurred some twelve years before the trial, and the testimony of Bushnell, one of the witnesses for the plaintiff on this subject, was so conflicting and so impeached by his former verified declarations contained in the affidavit and answer to which reference has been made, that no reliance could be placed thereon.   In the circumstances we do not feel warranted in holding that the trial court was not justified in accepting the testimony of Lindley.   If Curry had an interest in the stocks and bonds and they were pledged with Brayton Ives & Co., then authority was conferred on Brayton Ives & Co. to sell them on notice to the pledgor, and Lindley on purchasing them for value and without notice obtained good title, notwithstanding the fact that notice of the sale was not given to Curry, and this would be so also, if, as indicated by other evidence and found by the trial court, Brayton Ives & Co. held the securities under a power of sale.   (*Treadwell* v. *Clark*, 114 App. Div. 493, 506, and cases cited therein; *McNeil* v. *Tenth Nat. Bank*, 46 N. Y. 325; *Knox* v. *Eden Musee Co.*, 148 id. 441; *Matter of Mills*, 125 App. Div. 730.)

It follows, therefore, that the judgment should be affirmed, with costs.

CLARKE, P. J., DOWLING, SMITH and DAVIS, JJ., concurred.

Judgment affirmed, with costs.